# The Baltimore and Ohio Railroad Company *vs.* The State of Maryland.

*Construction of the Act of 1835, ch. 395, known as " The Eight Million Loan Bill," and of the Act of 1838, ch. 386—Effect of the Legal Tender Laws upon a Contract for the payment of money made prior to their Enactment.*

By the first section of the Act of 1835, ch. 395, the Legislature directed the Treasurer of the State to subscribe to the capital stock of the Baltimore and Ohio Railroad Company, the sum of three millions of dollars, to be paid in the manner and upon the conditions mentioned in the Act. By the ninth section, it was made a condition precedent to the subscription to the road, that the stockholders in general meeting should guarantee to the State the semi-annual payment out of the profits of the work, of six per cent. per annum, on the amount to be paid to the Company under the Act; such semi-annual payments to begin after the expiration of three years from the payment by the State of each successive instalment of its subscription, and to continue " until the clear annual profits of the railroad should be more than sufficient to discharge the interest which it should be so liable to pay to the State, and should be adequate to a dividend of six per centum per annum among its stockholders." After that period the State was " to have and receive a perpetual dividend of six per centum per annum out of the profits of the work, as declared from time to time, and no more;" and the surplus of profits over six per cent. was to be divided among the stockholders generally. The guarantee required by this section was given by the company and accepted by the State. By subsequent sections provision was made for the appointment of commissioners to proceed to Europe to negotiate loans, and for the issue of the bonds or certificates of stock of the State, to raise money for and on behalf of the State to gratify the purposes of the Act. These bonds or certificates were issued by the State, but the commissioners failed to negotiate the loan on the terms prescribed by the Act, and the company took the whole three millions from them at the minimum rate indicated by the Act, viz: twenty per cent. premium. This sale was ratified by the Legislature. The bonds, however, proved as unavailable in the hands of the company, as in those of the commissioners. As a measure of relief, the Act of 1838, ch. 386, was passed. Its first section provided that on the release by the company of its interest under the contract for the purchase of the six per cent. secu-

rities, and thei rdelivery to the Treasurer, the Commissioners of Loan should deliver to the company in exchange, sterling bonds or certificates of stock, payable in London and bearing interest at five per cent., payable semi-annually, at the rate of three thousand two hundred of the five per cents for every three thousand of the six per cents; provided, however, that the company should secure by mortgage or lien on all its property and revenues, the payment for three years, of the five per cent. interest semi-annually, ninety days before it became payable in London, together with the cost of remittance and exchange. The company did not begin to sell or negotiate the sterling bonds till about 1849. As they were disposed of, it paid the interest, &c., upon them for three years, and then applied thereto, directly, the six per cent. interest or dividend due the State, rendering no account of the difference. This system continued to the 1st of July, 1865; from which time the company made no payments of interest in London, but simply paid into the Treasury six per cent. per annum in currency, leaving to the State to pay the premium on gold for remittance, as well the cost of exchange, &c., and the gold besides. The State claimed that it was entitled to be fully indemnified by the railroad company, and that as the sterling interest could only be paid in gold, or its equivalent, the six per cent. guaranteed dividend could only be paid in like currency. In an action by the State against the company to recover the amount so claimed to be due and payable in gold, it was HELD:

1st. That as the law stood at the date of the contract by which the subscription to the stock of the company was made, and the bonds of the State were furnished as means of payment for such stock, the State could have required the guaranteed dividend to be paid in gold.

2nd. That likewise, at the date of the institution of the action by the State, the railroad company was bound to pay the dividend in gold; but that by the operation and effect of the Legal Tender laws recently declared by the Supreme Court of the United States to be constitutional, and applicable, alike, to contracts for the payment of money made prior to, and since their enactment, the railroad company was exonerated from such obligation; it not appearing either by express stipulation, or by fair implication, that it was the intention of the parties to the contract, that the dividend should be paid in gold specifically.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, GRASON, MILLER and ALVEY, J.

*Charles J. M. Gwinn, John H. B. Latrobe* and *Reverdy Johnson,* for the appellant.

Is the State a creditor entitled to interest, or a stockholder entitled to dividend, to be paid in the currency that is paid to other stockholders?

The Acts of 1835, ch. 395, 1836, ch. 261, and 1838, ch. 386, constitute, in this connection, a contract between the State and the company, the proper construction of which must turn upon the intention of the parties, apparent upon its face. Under the first of these Acts, the State, on making its subscription, became a stockholder, and nothing more. The mode provided, by the sale of currency bonds abroad, to enable the State to pay up its subscriptions, was independent of the subscription itself. The guarantee pledged the property of the company to pay the dividend of six per cent. *out of the profits of the work,* and without reference to the mode adopted by the State to procure the funds needed to meet its subscription.

The Act of 1836, ch. 281, made no alteration in this particular. Its main object was to increase the company's tolls, so as to enhance the profits out of which the perpetual dividend was to be paid.

Under the Act of 1835, the dividend on the preferred stock was to be paid out of the profits from tolls, then authorized. If these were not sufficient, the dividend might not be paid, in whole or in part. To obviate any probable difficulty here, the increase of the tolls under the Act of 1836, ch. 261, was specifically pledged. At this time the State still relied upon obtaining money abroad wherewith to pay its several subscriptions to works of internal improvement.

Upon these two Acts, the liability of the company is for semi-annual dividends on stock, and not for interest on a debt.

It is true, that what is called a perpetual dividend in the Act of 1835, is called, in the Act of 1836, a payment of interest on account of money, if any, which shall be paid to

the company under the Act of 1835. But any doubt, as to whether dividend or interest was meant by the Legislature, is removed by the declaration in the Act of 1835, that the payment is to be made " out of the profits of the work." Had interest been meant, these words would have been omitted— when the charge would have been on the property generally, as well as on the income or profits of the road; whereas, the use of the words "out of the profits" restricts it to these alone.

Now, the Act of 1836, ch. 261, adds to these profits by an increase of tolls, which are pledged specifically to the guarantee of the interest—thus showing, beyond question, that, in the eye of the Legislature, interest was as inseparably connected with profits as dividends were; or, in other words, that wherever the word " interest" was used in any part of said Act, it was as a word equivalent to "dividends." No change having been made by the Act of ·1836, ch. 261, was the Act of 1835, ch. 395, affected in this regard by the Act of 1838, ch. 386 ? This was the Act to provide the ways and means to meet the State's subscription of $3,000,000.

The State, in the first instance, had relied upon obtaining money abroad by the sale of its six per cent. currency bonds, issued under the Act of 1835, ch. 395. Failing in this, the company had purchased them from the State, and they were on deposit in the Union Bank of Maryland. If the company had sold them at the prescribed limit of $120 for $100, its connection with them would have ceased altogether: the holders would have looked to the State, and it alone, for their interest; and all that would have been incumbent on the company would have been to pay the six per cent. preferred dividends, as they fell due, into the State's Treasury, to swell the means out of which this interest, in common with the State's other obligations, would have been paid in currency.

Nor is this view of the subject changed by the provision in the 9th section, that the company shall guarantee to pay six per cent., &c., " until the clear annual profits of the said railroad shall be more than sufficient to discharge the interest

which it, (the company,) shall be liable to pay to the State of Maryland. The "interest" here is, of course, the "six per centum," previously mentioned, to be paid "out of the profits of the work;" and what these profits are, is placed beyond a doubt, as already said, by the subsequent reference to them as "the profits of the work, *as declared from time to time.*"

Under no obligation, then, with regard to the interest on the *currency* bonds, and bound only to pay a dividend on the stock which the sale of the bonds was to enable the State to pay for, what obligation was imposed by the Act of 1838, ch. 386, providing ways and means to meet the State's subscription? If there was nothing in the previous legislation which made the company responsible for the interest, why should it assume that responsibility now? Did it assume it? The Act speaks for itself. It was a new contract between the State and the company. What obligations did it impose? One only—that of paying the interest and attendant charges on the sterling bonds "*for three years from their date*"—giving security to that effect.

The company agreed to exchange their currency bonds for sterling ones in the proportions mentioned in the Act, and to pay the interest on the latter *for three years, and no longer*.

If the company was under no obligation to pay the interest upon the currency bonds when it received them from the commissioners, neither was it under any obligation to pay the interest on the bonds substituted for them, *beyond the terms of the agreement* under which the substitution took place.

So far as the payment of the interest on the sterling bonds and the attendant expenses for *the three years*, mentioned in the Act of 1838, is concerned, it may be admitted that it was to be irrespective of "the profits of the work;" and, for that time, the Act of 1838 superseded the provision which made the dividends or interest dependent upon that fund; but, at the expiration of the three years, the relations of the parties in this respect returned to what they were under the Act of 1835, ch. 395, sec. 9; nor have they since been changed.

So far from the subscription of the State, under the Act of 1835, chap. 395, being understood by the parties to be *a loan*, creating the relation in any manner of debtor and creditor, the 6th section authorizes the appointment of directors to represent this very stock—a stock which the State has since disposed of to numerous parties, who, without the right to a special representation, which was peculiar to the State, have now fallen into the body of stockholders represented by a general ticket. Further, in the 8th section, the State—presumed to use words understandingly—provides that no instalment shall be paid by the treasurer of the Western Shore on the State stock until an equal proportional payment shall be actually made by the "*other stockholders* on their shares of the capital stock of the company." In the 9th section itself, the State speaks of the distribution of the profits after paying the six per cent. dividend "*to the other stockholders ;*" and again, "*the other stockholders*" are spoken of in the same connection at the close of the section, where it is said, that "*any excess of dividends on the capital stock*" shall be distributed among them.

It may be admitted that "dividend" and "interest" are used in the several Acts of Assembly, here referred to, convertibly ; still there is, in fact, a difference between them. In some cases, "dividends" would be peculiarly appropriate, as "dividends on stock ; " and in another, "interest" would be the proper word, as "interest on a loan." There is but one way in which their proper meaning, in any particular case, can be settled, and that is, by reference to the subject-matter, in connection with which they are used. *Henry vs. The Great Northern Railway Co.*, 1 *De Gex & Jones*, 637.

If a debt is created, "interest" describes its income. If a stock is subscribed for, "dividend" is the proper word for that purpose.

If a debt is created, it carries interest, which is chargeable on the estate of the debtor as well as on his income. If a stock is subscribed for, its profits alone are chargeable. If

then we find that, whether this income is called "interest" or "dividends," it is, in so many words, chargeable upon profits only by the instrument in which it is stipulated to be paid, the conclusion seems irresistible that a subscription to stock, and not a loan creating a debt, was intended by the contracting parties, and this conclusion is confirmed, if it needs confirmation, when we find the party claiming the "dividend" or the "interest," styling itself, again and again, a "stockholder," and ranking itself among "the other stockholders."

There being then no words, in any of the Acts, referring to the State's subscription as a *loan;* but, on the contrary, finding these Acts speaking of the State, reïteratedly, as "a stockholder," the fact that its "interest," or "dividends," call it as we may, was expressly confined to the only source from which income was to be looked for by a stockholder, proves to demonstration that it was the relation of a stockholder, and not that of a creditor, in any sense of the word, that the State was made to occupy under the Act of 1835, and the subsequent Acts *in pari materia.*

If the State is to be regarded as a creditor, entitled to interest, is the company chargeable for it throughout the account, in gold; or had it not a right to pay it, and has it not still a right to pay whatever may be due in the legal currency of the United States?

The first question that arises here, is as to the nature of the contract between the State and the company, growing out of the Acts of 1835, ch. 395; 1836, ch. 261, and 1838, ch. 386. Was it a contract to keep the State harmless, or only a contract to pay six per cent. on a subscription to the capital stock of $3,000,000, regarding this as a debt carrying that rate of interest?

No such contract of indemnity can be inferred from the Acts of 1835 and 1836. The State subscribed to the stock; and undertook to procure, abroad, the money to pay its instalments. The idea of sterling bonds, out of which has

grown the present complication, was not suggested, even. If the currency stock had been sold abroad, the purchaser must have received here, in America, the interest due to him in the legal currency of the country. His being a foreigner would have given him no peculiar claims on the State.

The contract to indemnify, then, cannot be inferred even from the Acts of 1835 and 1836; because the necessity of an indemnity never could have arisen, and therefore cannot be supposed to have entered into the minds of the parties—the State and the company—when those Acts were passed. So far, indeed, from there being any intention to secure to the State what was necessary to enable it to pay its interest on the currency bonds, even—the State, in agreeing that the interest was to be paid "out of the profits of the work *as they were declared from time to time,*" took upon itself the risk of these profits amounting to six per cent.—being willing to do so, apparently, in the conviction that, having once reached six per cent. they would not subsequently be diminished.

The contract to indemnify, then, if it is to be found at all, must be found in the Act of 1838, ch. 386, under which the sterling bonds, or bonds payable in gold, were issued by the State.

It is not to be found there. The *only agreement* between the State and the company, in regard to interest under this Act, was limited, in so many words, "to the term of three years from the date of the bonds, or certificates of stock."

No one anticipated, at that time, the late war, or the rise in the price of gold that has made the present difficulty. It was in the power of the State to have provided for it in terms, however, had it been thought of; failing to do so, such a provision cannot be implied. *City of Baltimore vs. The Balt. and Ohio R. R. Co.,* 10 *Wall.,* 543.

There being then no agreement to indemnify, the remaining question is, whether the company, bound to pay interest on the $3,000,000 subscription as so much indebtedness, is bound, as the law now stands, to pay it in gold?

The State has not, by the Act of 1835, ch. 395, section 9, *in express terms*, required the company to pay the dividends there referred to in coin, and the company cannot, therefore, by intendment, be held bound to make such payment. *Bronson vs. Rhodes*, 7 *Wallace*, 229, 252; *Trebilcock vs. Wilson*, 12 *Wallace*, 695.

In construing this contract no intendments in favor of the State can be made. The Commonwealth appears before this tribunal as a shareholder, and not as a sovereign, and can claim the benefit of no other presumptions than are accorded to any other stockholder, or plaintiff having a like claim. The cases of *Bank of United States vs. Planters' Bank*, 9 *Wheat*, 904, and of *Curran vs. Arkansas*, 15 *Howard*, 304, recognizing this principle, have been expressly adopted in the case of *Brady vs. State*, 26 *Md.*, 302, 303.

The contract, created by the Act of 1835, ch. 395, section 9, was "*to pay money generally.*" All contracts to pay money, made before the passage of the Legal Tender Acts were created in the same terms. In every one of these contracts circumstances existed from which as plain an inference could be drawn that the parties intended that the payments should be made in the equivalent of coin; for coin, before the passage of the Legal Tender Acts, was the only legal measure of the selling price of every commodity, and of the consideration of every contract; and such intent must, of necessity, have existed. But the Supreme Court has not permitted such inference to be drawn from the circumstances of any contract. A person who loaned *gold*, before the passage of the Legal Tender Acts, cannot recover *gold* from the borrower, unless it was *expressly* stipulated that the loan should be returned in *gold*.

It does not matter, therefore, what were the reasonable expectations of the State in making its subscription, as to the precise value of the dividends it would receive under the guarantee made by the Act of 1835, ch. 395, section 9. *Legal Tender Cases*, 12 *Wall.*, 548.

The law is now well settled, that no person can be held to pay any debt, or to discharge any obligation in gold, or silver coin, *unless he has expressly contracted to make payment in such coin.* *Bronson vs. Rhodes,* 7 *Wallace,* 229, 252; *Trebilcock vs. Wilson,* 12 *Wallace,* 695. The legal tender notes of the United States suffice to pay all debts, and to discharge all obligations " *which are payable in money generally.*" *Trebilcock vs. Wilson,* 12 *Wallace,* 697.

*Philip F. Thomas, S. Teackle Wallis* and *I. Nevett Steele,* for the appellee, argued

That the statutes in question are to be construed, as a whole, in the light of the circumstances which induced their enactment, and the purposes which they were intended to accomplish. These were chiefly two : *First,* to establish and promote works of internal improvement by the aid of the State's credit; and, *secondly,* to protect the State and her citizens, as far as might be, against loss from so doing. It must be presumed to have been the intention of the Legislature, by the language which it used, to carry out its policy and discharge its duty in the premises, and such construction must, as far as possible, be given to that language as will make the legislative expressions effectual for the end in contemplation. *State vs. Boyd,* 2 *G. & J.,* 365; *Blizzard vs. Jacobs,* 3 *G. & J.,* 66; *Canal Co. vs. R. R. Co.,* 4 *G. & J.,* 152; *State vs. Milburn,* 9 *Gill,* 105; *Milburn vs. State,* 1 *Md.,* 17; *Frazier vs. Warfield,* 13 *Md.,* 279; *Mills vs. St. Clair County,* 8 *Howard,* 581; *Perrine vs. Ches. and Del. Canal Co.,* 9 *How.,* 187, 192; *Rice vs. R. R. Co.,* 1 *Black,* 380; *Stourbridge Can. Co. vs. Wheeley,* 2 *Barn. & Ad.,* 792; *Sedgwick on Stat. and Const. Law,* 338 to 342; *Brady vs. State,* 26 *Md.,* 303.

Construed according to these rules, the statutes in question, taken together, import substantially a contract and perpetual obligation on the part of the company to "secure the payment of the interest at the rate of five per centum" on the

sterling bonds for the State's indemnification. The "interest" provided to be guaranteed after the first three years, and the "dividend" provided to be paid later, are but the different forms in which the road was to do in effect, after the expiration of the first three years, precisely what it was to do before. The thing was to be done for three years, whether the road made profits or not. After three years, it was first to be done out of the gross profits, (*State vs. Balt. and O. R. R. Co.*, 6 *Gill*, 383,) after that, out of the net profits, but it was the same thing, no matter how it was to be done, or out of what.

Nor is this construction at all affected, except favorably, by the fact that, after three years, the "interest" or "dividend" of the State was made payable out of the "profits." Under the decision in 6 *Gill*, 383, "the profits of the work" out of which the guaranteed interest was to be paid, were gross profits—the whole earnings of the road. The "clear annual profits," which supply the perpetual "dividend" are held to be "the clear annual profits under the charter," viz: "net profits," (Act of 1826, ch. 123.) Thus it will be seen that the road was not to be relieved from its absolute "guaranty," covering all its resources, until its net profits should be at least equal to the payment of a dividend of six per cent. to the stockholders as well as the State. And the perpetual "dividend," then made payable to the State, though to come out of the "profits," was still to be subject to no contingency of profits, for the State did not agree to accept it in lieu of the guaranteed interest until it should first become a fixed and certain fact that the net profits would pay it.

The words "interest" and "dividend," mean one and the same thing, in all the laws in question, where the per centage to the State is provided for, and that is—taking the Acts of 1835 and 1838 together—interest to be paid to the State, to pay her sterling bonds. *Lane County vs. Oregon, 7 Wallace,* 74; *Henry vs. Great N. R. W. Co., 1 De Gex & Jones,* 637; *Matthews vs. Great N. R. Co., 5 Jurist, N. S.,* 284; *Crawford vs. N. Railw. Co., 3 Kay & Johns.,* 734, 735; 2 *Shelford's*

*Law of Railways,* (*Eng. Ed.,* 1869,) 161 ; *Godefroi & Short's Law of R. R. Companies,* 110, 111 ; 2 *Redfield on Railways,* 598 ; *Bates vs. The Androscoggin & Kennebec R. R. Co.,* 49 *Maine,* 491 ; *McLaughlin vs. R. R. Co.,* 8 *Michigan,* 103 ; *Stevens vs. South Devon R. R. Co.,* 12 *Engl. L. & Eq.,* 229, 234, 236 ; *Sturge vs. E. Union R. W. Co.,* 31 *Engl. L. & Eq.,* 406, 410, 416, 417.

If the foregoing points are well taken, it is not perceived that the Legal Tender Laws of the United States are involved in this controversy. This Court, as the highest judicial tribunal of Maryland, determining that the statutes of the State import a contract of indemnity, and that its disbursements in gold are therefore recoverable in gold, the matter is outside of all Federal question. The Supreme Court, in the latest phase of its legal tender decisions, has varied its previous opinions in but a single point. It has simply reversed *Hepburn vs. Griswold,* (8 *Wallace,* 603,) to the extent of determining that the Legal Tender Laws are constitutional as to contracts prior, not less than contracts subsequent to their enactment, (see 12 *Wallace,* 553.) It guardedly confines this decision to contracts to pay money simply, leaving other contracts, depending upon additional stipulations, to the effect of its previous decisions, (see 12 *Wallace,* 548.) Nay, in the still later case of *Trebilcock vs. Wilson,* (12 *Wallace,* 687,) it expressly re-affirms *Bronson vs. Rhodes,* (7 *Wallace,* 229,) by which special contracts are left to depend on their special provisions and the intention of the parties. By that decision, a contract to pay in coin is declared to be independent of the Legal Tender Acts, and enforcible according to its terms, notwithstanding their provisions, whether it be express or implied, (see 7 *Wallace,* 246, 252, 253, *in the opinion of the Court, and p.* 257, *the dissenting opinion of Mr. Justice* MILLER.) And in the case of *Lane County vs. Oregon,* (7 *Wallace,* 74,) the obligation to pay in gold was affirmed and enforced by the unanimous judgment of the Court, although the law of Oregon, under which it arose, contained not one

word as to the medium in which the taxes involved were to be paid. The Court said (p. 74) that it was "a legitimate, if not a necessary inference, that the taxes were required to be collected in coin," inasmuch as the tax collector was required to pay them in coin. "Nothing short of express words," adds the Chief Justice, "would warrant us in saying that the laws authorized collection in one description of money from the people, and required payment over, of the same taxes, into the county and State treasuries, in another."

It would seem quite as difficult to say, in the case under discussion, that the laws in controversy, while they oblige the State to pay in gold, permit the appellant to discharge its obligation of indemnity by paying the State's "dividend" in currency. 19 *American Law Register*, 79; *Bowditch vs. Soltyk*, 99 *Mass.*, 136; *Swain & Abell vs. Ches. Bank*, 29 *Md.*, 483.

The agreement under which this case was submitted to the Court concedes that the Legal Tender Laws are inapplicable, if the statutes import a promise to pay in gold. No question is submitted upon them by that agreement.

ALVEY, J., delivered the opinion of the Court.

This action has been brought by the State to recover of the defendant, the Baltimore and Ohio Railroad Company, a large sum of money claimed to be due on account, and payable in gold, growing out of the State's subscription to the stock of, or loan to the Company, of three millions of dollars, under the Act of 1835, ch. 395, entitled, "An Act for the Promotion of Internal Improvements," better known as the "Eight Million Loan Bill," passed on the 4th of June, 1836.

The defendant was incorporated by the Act of the Legislature of this State, at the December Session, 1826, ch. 123, for the purpose of constructing a railroad from the City of Baltimore to the Ohio river, with a capital stock of three millions of dollars, in shares of one hundred dollars each, with power to the company to increase its capital stock

from time to time, as it should ·be found necessary, in the progress of the work. Of this capital stock, the State reserved to itself the right to subscribe for ten thousand shares, being the one-third of the entire original stock of the company. To the city of Baltimore was also reserved the right to subscribe for five thousand shares—thus reserving to the State and the city the right to take one-half of the original capital stock. The State, however, authorized by Act of 1827, ch. 104, a subscription but for five thousand shares; and the city of Baltimore having subscribed for the five thousand shares reserved to it, the State and the city each became entitled to two directors in the company, to represent the stock so subscribed, according to the provisions of the Act of incorporation.

In the meantime, between these subscriptions and the passage of the "Eight Million Loan Bill," the Legislature of the State, by the Act of 1830, ch. 158, had authorized the defendant to embark in the enterprize of making a branch road, to afford easy communication between the city of Baltimore and the city of Washington, in the District of Columbia. The stock of this branch road was required to be kept separate and distinct from that of the main road; and of the stock necessary to construct and equip this branch road, the defendant was authorized to subscribe for all such portion of it as might not be subscribed for by other parties; and to borrow money, from time to time, to enable it to pay such subscription, and to pledge all its property and funds as a security for the payment of the money so borrowed. The State authorized a subscription of a half a million of dollars to such branch stock, which was made, and thereupon became entitled to two additional directors in· the company. (Act 1832, ch. 175.)

By the Act of 1835, ch. 127, passed February 25th, 1836, the city of Baltimore was authorised to make a further subscription of three millions of dollars, in addition to its former subscription, to the capital stock of the defendant, and which

was made under resolution of the Mayor and City Council, No. 40, dated the 17th of March, 1836 ; and for every five thousand shares of this last subscription, the city became entitled to an additional director.

Thus it appears that the State and the city of Baltimore, had become largely and most materially interested in the prosecution and completion of the works of the company ; as upon their completion and success depended the only chances of reimbursement and profit to either the State or the city, for their large outlay of capital, to say nothing of the large amount of individual subscription that had been made by the people of the State to the stock of the company. Indeed, it was regarded as of the greatest importance, in a commercial point of view, looking to the interest of the entire State, and especially to the city of Baltimore, that the completion of the road to its destined point on the Ohio river, should be assured beyond all peradventure.

Such then, was the relation of the State and of the city of Baltimore to this railroad company, and their great interest in the completion of its works, when, at the time of the passage of the Act of 1835, ch. 395, it was found to be necessary to extend the aid of the State to this and other internal improvement companies of the State.

By the 1st section of the Act just referred to, it was provided, that upon the assent and agreement to the several provisions of the Act, by the Chesapeake and Ohio Canal Company, and the Baltimore and Ohio Railroad Company, respectively, the Treasurer of the State should " subscribe to the capital stock of each of said corporations the sum of three millions of dollars, and pay for the same in the manner and upon the conditions thereinafter mentioned." As one of the conditions upon which the subscription to the stock of the defendant was authorized, it was required that a majority of the State's directors in the company should certify under oath, that, in their opinion and judgment, such subscription by the State would, in addition to all other subscriptions, be sufficient

to complete the road to the Ohio river. It was further provided, that the State should have an additional director in the company for every five thousand shares of stock subscribed for under the Act.

The 9th section of the Act contains the provisions more immediately involved in this controversy, and, so far as they relate to the railroad company, are as follow: "That before any subscription shall be made to the capital stock of the said Baltimore and Ohio Railroad Company, under and by virtue of this Act, the stockholders of said company shall, in general meeting assembled, stipulate, agree and bind the said company by a proper instrument of writing, signed by the president and under the corporate seal thereof, to be lodged with the Treasurer of the Western Shore, to guarantee to the State of Maryland, after the expiration of three years from the payment by the State of each of the instalments on the stock hereby authorized to be made to the stock of said company, *the payment from that time, out of the profits of the work, of six per centum per annum, payable semi-annually, on the amount of money which shall be paid to the said company under and by virtue of this Act,* until the clear annual profits of the said railroad shall be more than sufficient to discharge the interest, which it shall be liable so to pay to the State of Maryland, and shall be adequate to a dividend of six per centum per annum among its stockholders; and thereafter the State shall, in reference to the stock so subscribed for, and on so much thereof as the State may hold, *be entitled to have and receive a perpetual dividend of six per centum per annum, out of the profits of the work, as declared from time to time, and no more,* and all and so much of such annual profits as shall exceed six per centum, shall be distributed to the other stockholders according to their several interests in said company; and in consideration of the interest so to be secured to the State, th said Baltimore and Ohio Railroad Company shall be, and they are hereby authorized, in addition to the charge now authorized to be made by said company for the transportation

APRIL TERM, 1872. 535

Baltimore and Ohio R. R. Co. vs. State.

of passengers, to increase the price or charge for such transportation, to any amount not exceeding one cent per mile, for each person passing on said road." The guarantee required by this section was given by the company and accepted by the State.

The Act then provides, in subsequent sections, for the appointment of Commissioners to proceed to Europe to negotiate loans, and for the issue of the bonds or certificates of stock of the State, to raise money for and on behalf of the State, to gratify the purposes of the Act. The certificates of stock or bonds of the State were to be issued, in the aggregate amount not to exceed $8,000,000, redeemable at the pleasure of the State, after the expiration of fifty years from their date, and to bear interest at the rate of six per centum per annum, payable quarterly, either at the loan office in the city of Baltimore, or at some place in Europe, as might be arranged by contract. The certificates or bonds were not, however, to be sold at any rate or price which would yield to the State less than twenty per cent. net, above par. Of this premium, whatever part of it not required to pay the interest on the loan for three years after its negotiation, was, with its increment, directed to be invested, to constitute a sinking fund for the ultimate redemption of the debt incurred.

These bonds or certificates were issued by the State, but the Commissioners sent to Europe to negotiate the loan failed to negotiate it on the terms prescribed by the Act. After such failure to negotiate the loan by the Commissioners, they sold to the defendant, and to the Chesapeake and Ohio Canal Company, each, bonds amounting to $3,000,000. This disposition of the bonds by the Commissioners seems to have been regarded as without warrant of authority; but the State, by resolution of the Legislature, (Resolutions of 1837, No. 26,) ratified and adopted the contracts of sale, and declared the State's subscription to the stock binding, but declared at the same time that the bonds were to be rated to the companies at $120 for each hundred dollars of the bonds.

These six per cent. bonds, rated, as they had been by the State, at $120, appear to have been unsaleable by the companies to which they had been sold. In this state of things the State made further effort to facilitate these two companies in realizing money on its credit, and thus to aid and promote the accomplishment of what had been constantly in view from the beginning—the completion of its great works of internal improvements. To this end the Act of 1838, chap. 386, was passed. That Act is entitled, "An Act to provide ways and means to meet the subscriptions on the part of the State to works of internal improvements." By its 1st section, it provided, that upon the State being released by the railroad and canal companies from the contracts for the sale and purchase of the bonds issued under the Act of 1835, and the surrender of such bonds, the Commissioner of Loans should be authorized to deliver to the two companies, respectively, "an amount of sterling bonds or certificates of stock, to be redeemable in London at the pleasure of the State, at any time after fifty years from the date thereof, and to bear an interest of five per cent. per annum, payable semi-annually in London, on the first day of January and July in each and every year, equivalent to the amount of bonds or certificates of stock delivered up by the said companies respectively as aforesaid; and in thus changing the bonds or certificates of stock already issued under the Act aforesaid, for the bonds or certificates of stock hereby created, the said Commissioner of Loans shall give to the said companies respectively, in the proportion of three thousand two hundred dollars of the bonds or certificates of stock hereby created for every three thousand dollars of the bonds or certificates of stock so to be delivered up; *provided, however*, that the said companies respectively shall secure by mortgage, or other lien, on all the property and revenues of said companies respectively, to the satisfaction of the Treasurer, the payment of the interest, at the rate of five per centum per annum, on the stock created by this Act, semi-annually, at least ninety days before the

first day of January and July in every year, for the term of three years from the date of the bonds or certificates of stock, together with the cost of transmitting said interest to London to be there paid, and also the difference in the exchange of currency between London and the city of Baltimore." None of the State's liens and priorities then existing were to be in any way impaired or affected by any of the provisions of the Act. The only changes, therefore, effected by this Act of 1838, were the substitution of the five per cent. sterling securities for the six per cent. securities issued under the Act of 1835, and the requirement of security, by way of mortgage or other lien, or the retention of bonds, for the payment of interest for the first three years, instead of the twenty per cent. premium at which the bonds issued under the Act of 1835 were required to be sold, and which was supposed at the time to be sufficient to pay the interest for the first three years after the negotiation of the loan under the last named Act. In all other respects the rights of the parties remained as they were before the passage of the Act of 1838.

The special contract, then, that gives rise to the present controversy, is found in the terms of the 9th section of the Act of 1835, chap. 395, as modified and extended by the 1st section of the Act of 1838, chap. 386.

The bonds that were issued to the defendant by the State, under the Act of 1838, owing to difficulties in disposing of them to advantage, were not appropriated by the company until about the year 1849, when they were placed on the market in Europe, and sold. As they were disposed of, the defendant paid the interest on them as it accrued due, and all costs and difference in exchange, for the period of three years, and, after the expiration of that period, it continued to pay such interest, cost and exchange, by applying directly the State's guaranteed dividend of six per cent. on the stock subscribed under the Act of 1835, instead of paying it over to the Treasury. The defendant rendered no account, but treated the six per cent. dividend as equivalent to the five per

cent. sterling interest, with the costs and exchange; and this continued to be its course of conduct to the 1st of July, 1865, from which time it ceased to apply the six per cent. dividend as formerly, but paid it directly into the State Treasury *in currency notes.* The State has been, therefore, required, from the 1st of July, 1865, to the present time, to provide for the payment of the sterling interest in London, together with all costs and difference in exchange, which, of course, had to be adjusted to a gold standard, while it had been in the receipt of the six per cent. dividend in currency, the value of which has been very much less than gold.

The State claims that it is entitled to be fully indemnified by the defendant; and that, as the sterling interest could only be paid in gold, or its equivalent, the six per cent. guaranteed dividend could only be paid in like currency. This, of course, depends upon the true construction of the contract, by which the subscription to the stock of the defendant was made, and the bonds of the State were furnished as means of payment for such stock.

At the trial in the Court below, the cause, by agreement, was submited to the Court without the intervention of a jury; and it was agreed that the cause should be referred to a special auditor to adjust the account between the parties; and that the Court should determine upon a proper construction of the Acts of the Legislature of the State, relating to the subject-matter, whether the six per cent. dividend provided by the Act of 1835, ch. 395, to be guaranteed and perpetually paid to the State by the defendant, was and is, or was and is not due and payable in gold. If payable in gold, a judgment for the State to be entered for the amount ascertained to be due; and if not so payable, judgment to be entered for the defendant.

Upon the Auditor's Report, stating the account in various aspects, the Court below, upon determining the dividend to be payable in gold, found the sum due at the date of the judgment to be $281,489.39, for which judgment was entered,

payable in gold, and from which judgment this appeal is taken.

Now, in order the more clearly to determine as to the rights of the parties under the contract in question, it is proper that we first advert to the law as to what currency was legal tender at the date of the subscription for the stock by the State, and what currency constitutes a legal tender at this time.

At the date of the subscription in question, nothing but gold and silver coin constituted a legal tender for the discharge of debts contracted to be paid in dollars and cents generally. At that time the opinion prevailed everywhere, as well in the Senate as in the Courts, that gold and silver were the only legal tender that could be ordained, either by Congress or the Legislatures of the States. As evidence of this, Mr. Webster declared in 1836, in the Senate, himself no strict constructionist, that " Most unquestionably there is no legal tender, *and there can be no legal tender* in this country, under the authority of this Government, or any other, but gold and silver, either the coinage of our mints, or foreign coin, at rates regulated by Congress. This is a constitutional principle, perfectly plain, and of the very highest importance. The States are expressly prohibited from making any thing but gold and silver a tender in payment of debts ; and although no such express prohibition is applied to Congress, yet, as Congress has no power granted to it, in this respect, but to coin money and to regulate the value of foreign coins, *it clearly has no power to substitute paper, or any thing else, for coin as a tender in payment of debts and in discharge of contracts.*" (4 Webster's Works, 265, 271.) This was the generally received opinion, and the acts and conduct of parties were regulated accordingly. The Supreme Court of the United States had declared in 1819, by its then great Chief Justice MARSHALL, that " *Nothing but gold and silver coin can be made a tender in payment of debts." Sturges vs. Crowninshield*, 4 *Wheat*, 122, 205. And in the subsequent case of

*Gwin vs. Breedlove*, 2 *How.*, 38, it was said, in confirmation of what had been previously declared, that "By the Constitution of the United States, gold and silver coin made current by law, can *only* be tendered in payment of debts."

Relying, then, upon what was regarded as the settled law, beyond dispute or alteration, parties the most careful for the protection of their rights, at the period of the making the contract here involved, could well proceed in making their contracts upon the assumption that no other currency than gold and silver coin would ever be attempted to be made a legal tender.

Former opinions, however, of Judges and statesmen, however well founded, are no longer the received law upon this subject. The Congress of the Union, by several Acts, commencing with that of the 25th of February, 1862, known as the "Legal Tender Acts," have declared that the notes thereby authorized to be issued shall be a legal tender in payment of debts, public and private. The constitutionality of these Acts has been brought into question before the highest Judicial Tribunal of the country, and their constitutionality finally sustained, though with much division of opinion. The first case in which the question came directly under adjudication, was that of *Hepburn vs. Griswold*, 8 *Wall.*, 603. In that case it was decided, by a divided Court of five to three Judges, that the legal tender clause in the Acts referred to was, so far as it applied to debts contracted before their passage, unwarranted by the Constitution of the Union. It was also decided that all contracts made prior to the 25th of February, 1862, for the payment of money, *not expressly stipulating otherwise*, were, in legal effect and contemplation, contracts for the payment of coin, and, under the Constitution, the parties to such contracts were respectively entitled to demand and bound to pay the sums due, according to their terms, in coin, notwithstanding the legal tender Acts. But this decision was allowed to prevail but for a short season. It was brought under review in the recent cases of *Knox vs.*

*Lee* and *Parker vs. Davis*, 12 *Wall.*, 457, and the conclusion last arrived at, also by a divided Court of five to four Judges, is, that the legal tender clause in the Acts referred to is constitutional, as well when applied to contracts made before as to those made since the passage of the Acts.

This last decision is now the law, binding alike upon this Court and all the other Courts of the country; and, so far as it is applicable to the case now before us, must guide and control our judgment.

It is settled, however, that the Legal Tender Acts only apply to debts which are payable *in money generally*, and not to contracts payable in coin specifically, nor to contracts payable in commodities; and that when a contract for money is by its terms made payable in specie or coin, judgment may be entered thereon for coined dollars. This has been recently ruled by the Supreme Court, in the case of *Trebilcock vs. Wilson*, 12 *Wall.*, 687, in conformity to previous decisions.

In view of the law as it now stands, it is plain, that, to enable the State to recover in this case, it must be shewn, either by express stipulation or fair implication, that the obligation of the defendant was to pay the six per cent. guaranteed dividend in gold; or otherwise it could be, and has been, paid and discharged as it accrued due, by legal tender notes.

The preliminary question much discussed in the arguments at bar, whether the relation of the State to the defendant, as to the subject-matter involved in this case, is that of creditor, or stockholder merely, is one, in our view, not very material to be decided. It is certainly true, however, that the State, by virtue of its subscription of the three millions of dollars to the stock of the company, did, in some sense, and to many purposes, become a stockholder; but, at the same time, it may be conceded that it became something more; and as its stock was preferred, and a six per cent. dividend perpetually guaranteed, out of the gross profits of the company, a quasi relation of creditor was created, as well as that

of stockholder. But whether we call the six per cent. dividend interest on a loan, or dividend on stock as such, is quite unimportant—as, let it be the one or the other, the claim to have it paid in gold depends upon the terms of the contract—it being perfectly competent to the parties to stipulate for the payment of either interest or dividends in gold.

This, then, brings us directly to the question: Was the obligation of the contract by its terms to pay the six per cent. dividend in gold, and nothing else? It is conceded that it is not required by any *express* terms of the contract; and if required at all, it can only be by implication—taking all the terms and conditions of the contract together. And while it is readily conceded that the real intention and obligation of the parties may be arrived at by implication in the absence of express stipulation, still, that implication must be the result of a fair and reasonable construction of the contract itself. It must not be founded upon conjecture, mere probabilities, nor upon what now appears to have been reasonable and proper for the parties to have done in order to accomplish the object in view. The question is, were the particular means contemplated to the end, and provided for by the contract itself, in such manner as to be fairly discoverable by the application of just rules of construction? And here it is proper to note a well recognized distinction between the mere expectation of parties, founded upon extrinsic circumstances, and the duty imposed by the contract itself. " The expectation of the creditor," said the Supreme Court in the legal tender cases before referred to, (12 *Wall.*, 548,) " and the anticipation of the debtors may have been that the contract would be discharged by the payment of coined metals, but neither the expectation of the one party to the contract respecting its fruits, nor the anticipation of the other, constitutes its obligation. There is a well recognized distinction between the expectation of the parties to a contract, and the duty imposed by it. Were it not so, the expectation of results would be always equivalent to a binding engagement that they should follow. But the

*obligation* of a contract to pay money, is to pay that which the law shall recognize as money when the payment is to be made. If there is anything settled by decision, it is this, and we do not understand it to be controverted."

Now, applying these plain and well settled rules, upon what reasonable ground are we to infer and conclude that it was the intention of the parties to the contract in question, to make it the legal obligation of the defendant, to pay the six per cent. dividend in gold specifically, instead of money generally? We have not been able to discover any sufficient ground to justify such a conclusion, and think none exists. The terms of the contract in reference to the payment of the dividend, are, that the State should receive payment "out of the profits of the work, of six per centum per annum, payable semi-annually on the amount of money which shall be paid to the said company, under and by virtue of this Act, until the clear annual profits of the said railroad shall be more than sufficient to discharge the interest, which it shall be liable so to pay to the State of Maryland," and to pay a dividend of six per cent. per annum amongst its stockholders; after which the State shall be entitled " *to have and receive a perpetual dividend of six per centum per annum, out of the profits of the work, as declared from time to time, and no more.*" It will be observed that there is nothing in the language here used, to indicate, in the slightest degree, the intention of the contracting parties to make the dividend on the stock subscribed by the State, payable in gold, or in any other currency than money generally.

It has been ably and earnestly contended, however, on behalf of the State, that it was the intention at the time that full indemnity should be furnished by the defendant for all outlay in defraying the five per cent. sterling interest in London, together with all costs and exchange; and as to do which the State has been required to purchase gold at large premium rates, nothing of less value should be received in payment of the six per cent. dividend; that it was the intention

that the dividend should be equivalent, and always adequate to pay, the sterling interest and all incidental expenses. This, in one sense, may be conceded, as it was doubtless the supposition at the time that such would be the effect and operation of the arrangement between the State and the defendant. But, as we have seen, it is not what was expected or anticipated as the result of the arrangement, but the legal obligation of the contract, that binds the parties. The defect in the contract now under consideration, tried by the law as it now exists, is, that it did not contemplate and provide for the present state of the Legal Tender Law. At the period when this contract was made, it is not likely that it ever entered into the thoughts of the parties concerned, that any thing but gold and silver coin could ever be made a legal tender for the discharge of contracts. It was, therefore, futile and utterly useless, viewing the matter from that period, and in the light of opinions then prevailing, to incorporate into the contract any such special obligation as that the dividend should be paid in gold. As the law then stood, it could be paid in that currency and none other, if the State thought proper to insist upon it. It is only by the operation and effect of the Legal Tender Acts, recently declared constitutional by the Supreme Court, that the defendant is now exonerated from the liability supposed, at the date of the contract, to be immutable, to pay the guaranteed dividend in gold. If the law had been allowed to remain as it was declared to be by the decision in *Hepburn vs. Griswold*, 8 *Wall.*, 603, which was the law of the land at the time of the institution of this action, the defendant would have been bound to pay the dividend in gold. But this last mentioned decision having been in part overruled, and the Legal Tender Acts given an application to contracts made prior to as well as to those made since the passage of those Acts, the contract involved in the present case falls within their operation.

In addition to the foregoing considerations, there are others, suggested by the very nature of the contract itself, its objects

and purposes, and the relation of the parties at the time, that resist the conclusion that it was intended to make the dividend payable in gold specifically, rather than in money generally. Apart from the then want of reason for incorporating such a provision in the contract, it must be borne in mind, that the State was contracting not with a stranger and a party alien to its interest, but with a creature of its own creation, endowed by its sovereign will with powers and capabilities to accomplish what was most anxiously desired and expected— the development of the State's great resources of wealth, and the promotion of its commercial prosperity. The State and the city of Baltimore had, at the time of the subscription in question, become largely identified in interest and expectation with the enterprise itself; and it was in aid and support of the work, as a great State scheme of improvement, that the subscription was made. Why, then, should we suppose that the contract of subscription was intended to be one of peculiar strictness as to the currency in which the dividend should be paid, dependent as it was made, upon the gross profits of the works? Indeed, at the time of this contract, it was a thing of rare occurrence for parties to stipulate specially for payment in gold—the general rule being to make contracts payable in money generally, the law designating with certainty in what currency they could be paid.

The case of *Lane County vs. The State of Oregon*, 7 *Wall.*, 71, was much relied on in the argument for the State, as furnishing an instance where the obligation to pay gold was implied from the nature of the case itself. But we think the analogy between that case and the present is very imperfect. In that case the taxes, by the express terms of the law, were required to be paid over by the receivers of them, in gold and silver coin; and the State Courts having held that the statute of the State of Oregon required, either directly or by clear implication, the collection of the taxes in gold and silver, the Supreme Court said that such construction had nothing strained or unreasonable in it. Of course, if the taxes were

Baltimore and Ohio R. R. Co. *vs.* State.

collectible in gold and silver coin, and it was made the duty of the State's agents to collect them in that currency, it was the State's right to have them accounted for in that currency and none other. And such was the point of the decision in that case.

It appearing to this Court that the six per cent. guaranteed dividend was and is payable by the defendant in money generally, and not in gold specifically, the judgment of the Court below must be reversed, and, under the agreement of the parties, judgment will be entered for the defendant.

> *Judgment reversed, and*
> *judgment for the defendant.*

(Decided 21st June, 1872.)

STEWART, J., delivered the following dissenting opinion:

This Court, in the opinion delivered by Judge ALVEY, has rested the reversal of the judgment of the Superior Court of Baltimore City and the determination of the case, upon the authority of the recent decisions of the Supreme Court of the United States in regard to the operation and effect of the Legal Tender Acts of Congress, upon the theory that the case comes within the federal jurisdiction.

The learned Judge of the Superior Court, in pronouncing his judgment with the same decisions before him, had reached a different conclusion, and adjudged that the contract here in question, authorized the State to demand the debt incurred thereby, to be paid *in gold*, and was not within the scope of the Legal Tender Acts as expounded by the Supreme Court.

With great respect for the opinions of the majority of my brethren, it seems to me the judgment below ought to be affirmed; and it is proper and due to the magnitude of the case and the importance of the principles involved, as well as to my brethren, that I should state the reasons as they occur to me for this conclusion.

The suit was instituted by the State against the company, to recover the amount of interest paid by the State in gold on the sterling bonds of the State issued under the authority of the Act of 1838, ch. 386.

The bonds having been passed to the company by virtue of said Act, the company had paid the interest thereon from the time of their negotiation in 1849, until July, 1865, when it declined further to pay the interest; and the State, to maintain her credit, having paid the interest in gold from that time, claimed that the company was bound in good faith, and according to the provisions of law authorizing the issue of the said bonds for the use of the company, to indemnify the State. The company, on the other side, insisted that it was only bound to pay the six per cent. provided by the Act of 1835, ch. 395, and that this it could pay in currency since the passage of the Legal Tender Acts by Congress.

Under an agreement of the parties, the case was submitted to the Court to determine from the interpretation of the Acts of 1835, ch. 395, 1836, ch. 261, 1838, ch. 386, and the other legislation of the State creating the contract between the parties, whether the company was bound to pay to the State the six per cent. provided by the Act of 1835, ch. 395, in gold.

As I understand the question in issue, it is substantially whether the company is bound, by the relations between the parties created by the said Acts, to pay back to the State in gold, the money the State has paid on the sterling bonds issued under the authority of the Act of 1838, ch. 386.

There could be no difficulty about the case if what constituted a legal tender at the time of the creation of the dealings between the parties by the Acts in question, was unaffected by the Legal Tender Acts and the decisions of the Supreme Court thereon, which are now considered by a majority of this Court conclusive of the case. Although I consider the said Acts and decisions as not applicable to this case, still it is proper I should at least advert to this aspect of it, as my brethren have rested their decision upon them.

It is a sound and well settled rule of interpretation respected by all judicial tribunals, that the established law should not be held repealed or modified by subsequent statutory provisions, unless they are clear and explicit to that effect. The same principle is applicable to all adjudications of the Courts. It is due to the good faith and integrity of contracts and the honesty of all human transactions affected thereby, that the firmly recognized law should not be considered as overturned by judicial rulings, unless such is their plain effect beyond question.

According to these canons of judicial construction, I have not been able to discover in the Legal Tender Acts and the decisions of the Supreme Court thereon, clear authority for the reversal of the decision of the Superior Court.

It had become an established maxim of constitutional law, and so regarded by all the authorities of the Federal Government and the States, and as such recognized by all judicial tribunals throughout the country, that nothing but gold and silver could constitute a legal tender in the payment of debts or discharge of contracts. The States were prohibited from making any other tender, and the Federal Government was clothed with no power under the constitution to substitute paper, or anything else as a legal tender. Every body understood this to be the established constitutional law upon the subject, and contracts and dealings were regulated by parties according to this standard.

But during the late civil war—when expedients were adopted of questionable character in times of peace, and when the federal authority was stretched to the utmost extent, and unusual and extraordinary powers were assumed and exercised, upon the ground of military necessity, under the urgent circumstances existing, the Congress of the United States, in undertaking to meet the exigencies of the occasion, passed, after considerable opposition, the Legal Tender Acts of February 25th, 1862, July 11th, 1862, March 3d, 1863, June 30th, 1864, and the joint resolutions of January 17th,

1863, declaring the notes thereby authorized to be issued, to be a legal tender in payment of debts, public or private.

These proceedings were regarded by the Congress of the United States at the time as justified, more as war measures than as strictly and truly within its constitutional authority. It is certainly not the safest rule to place implicit reliance upon acts done or precedents adopted in the critical exigencies or extraordinary circumstances of a wide-spread civil commotion, threatening in its results fundamental dismemberment and disorganization of the government and its various departments. Accordingly it was found that when the constitutionality of these acts of Congress was first brought in question before the Supreme Court of the United States, in the celebrated case of *Hepburn vs. Griswold*, 8 *Wall.*, 603, that Court decided by *five* judges to *three* that the Act was in violation of the Constitution so far as applicable to contracts antecedent thereto, and that all contracts prior to the passage of the Act for the payment of money, without express stipulation to the contrary, were payable in gold and silver.

In the later cases of *Knox vs. Lee* and *Parker vs. Davis*, 12 *Wall.*, 457, when the two additional judges that had been appointed subsequent to the decisions in the former case, sat, the Court, by five judges against four, (the two new judges concurring with the previous minority,) thus making a bare majority, overruled the doctrine held in the case of *Hepburn vs. Griswold*, and decided that the Legal Tender Acts are constitutional, and apply equally to debts contracted before or after their passage.

But the Court, as at present constituted, in the case of *Trebilcock vs. Wilson*, 12 *Wall.*, 687, in accordance with previous decisions, has determined that the Legal Tender Acts only apply to debts payable in money generally, and not to special contracts which require payment in coin, and sanctions the law asserted in *Bronson vs. Rodes*, 7 *Wall.*, 229, leaving special contracts to be construed by their particular terms, so as to effectuate the intention of the parties, of course,

in regard to the medium of the payment as to other constituents of the contract.

In the case of *Lane County vs. Oregon*, 7 *Wall.*, 74, the whole Court affirmed the obligation to pay the taxes in gold from mere implication.

From a careful examination of all these cases, together with *Butler vs. Horwitz*, 7 *Wall.*, and the *Legal Tender Cases*, 12 *Wall.*, 553, it is apparent that although the Supreme Court has reversed the decision of *Hepburn vs. Griswold*, thereby affirming the constitutionality of the Legal Tender Acts, when applied to debts contracted before their passage, as to those afterwards; that Court has not decided that those Acts are applicable to all contracts indiscriminately. But as to contracts with special provisions, express or implied, requiring a different medium of payment, that Court, I think, has made a distinction, that they are beyond the operation of the Legal Tender Acts. When the medium of payment is provided for expressly or impliedly, and is made an ingredient of the contract, or when its terms and provisions fairly require, in order to carry out the intention of the parties, that the payment shall be in gold—how could the integrity of the contract be held unimpaired by a different construction, &c.?

The States are restricted from the enactment of laws impairing the obligation of contracts, and certainly no authority is conferred on the Federal Government, or any department thereof, to exercise such power. No construction should be given to any decision of the Supreme Court that can be consistently avoided, that would operate to trench upon the inviolability of contracts, or in effect repudiate their integrity.

At the time the cause of action accrued in this case, and when the trial was first had, as the unquestioned law and rulings of the Supreme Court then stood, the claim of the State was recoverable in gold. The late decisions having intervened, it is insisted, have deprived the State of the right to demand payment in gold. I submit, with due deference,

that the law of tender, since the passage of the Legal Tender Acts, and the decisions of the Supreme Court thereon, is uncertain and unsettled in many respects, and that the last decision of the Supreme Court, changing the law of legal tender as understood before, is liable to be reviewed and reversed by their successors, and that the example of reversing the rulings of their predecessors may be followed with quite as much facility as *their* rulings, and the ancient and well-established law as recognized by the founders of the republic and the illustrious jurists and statesmen of former times, as well as their contemporaries, may be restored. See opinion of Chief Justice MARSHALL, in *Sturges vs. Crowninshield*, 4 *Wheaton*, 122, 205, and the judgment in *Gwin vs. Breedlove*, 2 *Howard*, 38, and 4 *Webster's Works*, 265, 271, referred to in the opinion of the Court in this case.

The former decisions of that Court have been reversed to a qualified extent only, and this has been by a bare majority of the Judges. Under these circumstances, whilst recognizing the authority of these decisions in regard to the constitutionality of the Legal Tender Acts, and with every disposition to treat them with the respect due to our highest judicial tribunal, whenever their views are clearly announced; it is at the same time due to that Court, where their rulings are doubtful, and the antecedent law so clearly settled, that they should not be misunderstood, and effect given to their decisions to an extent not contemplated by them. Every reasonable effort should be made to give such construction to their decisions as will reconcile them, if practicable, with the antecedent law, and thus administer substantial justice between litigants, and maintain the integrity of their contracts.

From the obscurity and uncertainty of the law of legal tender now upon the subject, to make the most of it towards sustaining the views of the company, upon the assumption that the contract in this case is not one of indemnity to the State for its disbursement in gold for the company; and that it can be brought within the range of federal jurisdiction, I

do not think the case ought to be decided on the ground taken by the majority of this Court, to wit: that the question involved here has been authoritatively adjudicated by the Supreme Court.

On the contrary, according to my apprehension, the *Supreme Court has not settled any such principle; and it seems to me, under the circumstances, the decision of the Superior Court ought to be affirmed, and the option given to the company to have the case reviewed by the Supreme Court, when that Court can authoritatively decide whether, according to their views, the provisions of the contract here in question, are reached by the Legal Tender Acts.*

Much of the able and ingenious argument of the learned counsel of the company was directed to show that the State was a mere preferred stockholder in the company, and not a creditor, which latter capacity might entitle her claim to greater consideration.

I concur with the majority of the Court, that whether the State was the one or the other, or both, in a qualified sense, does not materially affect the question involved, because in either character the State was entitled to be paid in gold, as the law of tender stood at the time of the contract.

But the rights of the State are not precisely and fully stated, or certainly not to their equitable extent, by considering the State as claiming simply in either of these capacities as ordinarily understood, because the State has equities beyond those of a mere stockholder or creditor. The State may in some sense be described in her relations with the company, as a creditor or stockholder; but in truth, as I understand the transaction made by the statutes in question, *the State, by the issue of her bonds, merely intended to facilitate and aid the company, by enabling it to effect a loan through the credit of the State; and the company to indemnify and secure the State from loss, undertook, in the mode and form prescribed by the Acts of the Legislature authorizing the loans, to furnish that security or indemnity.* In order that the State might

the better accomplish this result and have the corresponding power to protect her interests in the matter, she was constituted a *quasi* stockholder in the company, with proportional authority in the board of directors of the company—*The State consenting to take stock under the limitations prescribed by the statutes, with the guarantee of the company to pay six per cent. from the profits of the work, for the purpose of securing herself in that way.*

The enterprise being one of great promised public utility, and calculated largely to develop the resources of the State, had claims upon the State, as the sovereign authority, to lend its assistance to promote the success of the company. Such considerations and inducements undoubtedly prompted the State to lend her credit to the company and to incur the risk of the security upon the guaranteed payment of the six per cent. from its profits, which were for that purpose and to that extent sacredly dedicated and pledged by the contract. The substantial import of the transaction between the State and the company, shows very conclusively to my mind, that it was a contract to secure the State, on account of the State becoming responsible for the company on the loan made to the company; that the company, for the purpose of indemnifying and securing the State on account thereof, gave the lien of six per cent. per annum interest on the debt upon the profits of the company.

This is the substance of the arrangement between the parties, disclosed by the provisions of the statutes relating to the transaction as between the State and the company. The former stands rather as the surety or guarantor of the latter on the sterling bonds; and in good faith, the company, the true debtor, has bound itself in effect by the stipulations of the contract, to pay the interest of this debt in gold, in order to relieve and indemnify the State, which duty it punctually performed until July, 1865, after which, failing to do so, and the State to maintain her credit, having been compelled to pay the interest for the company, now has a just and valid

claim to be fully indemnified for her disbursements on that account.

This I take to be the true and legal theory of the contract. But if it is not in legal effect a contract of indemnity, and it is simply an ordinary contract on the part of the company to pay the State the six per cent. interest on the amount of the loan, or substituted stock as the creditor, or preferred stock-holder of the company; in that event the nature of the contract requires that the company shall pay its debt to the State in the same medium of payment the State has to discharge the debt contracted for the company—the State being obliged to pay in gold—the company, by virtue and in pursuance of the contract, is under a legal obligation to discharge its debt to the State in gold.

I hold that no rulings of the Supreme Court, *under the Legal Tender* Acts, authorize a *different medium of discharge.*

A brief examination of the stipulations between the State and the company, as indicated by the legislation of the State, referred to in the agreement, will clearly show, according to my judgment, that it was a contract of indemnity by which the State was to be secured and kept harmless by the company, under the arrangement made by the various provisions and stipulations found in the statutes upon the subject.

The Act of 1835, ch. 395, provided for currency six per cent. bonds of the State, to be met and discharged by the six per cent. interest or dividend to be paid by the company. The terms of that Act were modified by the Act of 1838, ch. 386, by substituting in the place of the six per cent. currency bonds, the five per cent. sterling bonds, and the contract was changed by the consent of the parties accordingly.

The company could have paid the six per cent. interest in currency to meet the interest upon the bonds of the State, payable in like medium, (currency,) as authorized by the Act of 1835, ch. 395, so long as the provisions of that Act continued to embrace the terms of the contract, and currency might be the medium of payment of both; but, by the

acceptance of the provisions of the Act of 1838, ch. 386, and the modifications made in the previous contract thereby, the company became bound to pay the six per cent. on the debt or stock in gold, because of the five per cent. interest in gold to be paid by the State on the sterling bonds authorized by the Act of 1838, ch. 386.

The contract of the parties was converted by that Act into mutual stipulations for payment in gold. This was the effect of the Act of 1838, ch. 386, changing the currency bonds of the State into sterling bonds, affecting alike each party in regard to the medium of payment. These statutes created the contract between the State and company, by which the State practically authorized the company to use the sterling bonds in effecting a loan for her own accommodation; the company agreeing to secure the payment of the interest thereon for the State's indemnification.

It was to all intents and purposes, when reduced to its plain elements, free from the mass of verbiage used in the statutes, the debt of the company itself. It was neither an investment by the State in the stock of the company, nor a subscription to its stock simply as an ordinary creditor or stockholder, but a form adopted by the parties to secure the State for the loan of the bonds to the company.

What is there in the whole proceeding reduced to its natural dimensions, to show it to be any other thing than the debt of the company contracted by it through the agency of the State, and upon the guaranty of the State; the interest of the debt secured to be paid to the State by the lien of six per cent. on the profits of the work?

This seems to me to be the plain and simple analysis of the 9th section of the Act of 1835, ch. 395, and the 1st section of the Act of 1838, ch. 386; the material provisions creating the contract between the parties. By the said 9th section the State was entitled to secure a perpetual dividend of six per cent. per annum from the profits of the work, and no more, on account of the loan contracted by or for the company, for

which the State agreed to become responsible. The transaction assumed this form to secure the State for the advance to the company of the six per cent. bonds thereby authorized. The State was restricted to the receipt of six per cent., whilst the stockholders generally might receive more or less, according to the profits of the enterprise.

This fact, *per se,* is sufficient to show that the State was not a mere stockholder. Besides, this Court has decided (*State vs. Baltimore and Ohio R. R.,* 6 *Gill,* 383, 384,) that the guarantee to the State of the six per cent. under the Act of 1835, ch. 395, is from the gross profits of the work, and in no manner impaired by the Act of 1838, ch. 386; shewing very clearly the State was not an *ordinary stockholder.* Under the 1st section of the Act of 1838, ch. 386, upon the acceptance of the provisions of that Act by the company, and the execution of the required guarantee, sterling bonds redeemable in London at any time after fifty years, bearing interest at five per cent., payable semi-annually in London, on the 1st of January and July in each year, were authorized to be issued for the use of the company in lieu of the previous securities authorized by the Act of 1835, ch. 395; and equivalent to the amount of the bonds delivered up by the company. The Commissioner of Loans was required to give to the company in the proportion of $3,200 of the sterling bonds for every $3,000 of the prior securities delivered up—the company paying the interest at five per cent. on the stock created by the Act semi-annually, at least ninety days before the 1st of January and July, for the term of three years from the date of the bonds, together with the costs of transmitting the interest to London to be there paid, and also the difference in exchange of currency between London and Baltimore. In brief, under the Act of 1835, ch. 395, the interest on the loan of the currency bonds authorized by that Act was to be met for three years from the expected premium on the sales of the bonds; after that time the company guaranteed six per cent. to the State.

Under the Act of 1838, ch. 386, the five per cent. sterling bonds were substituted for the former bonds, and the company agreed to pay the interest *eo nomine* for three years, in lieu of the premium on the currency bonds, to be secured by reservation of bonds. There was no occasion for further provision in this last Act as to the payment of the interest, because that was already secured by the Act of 1835, ch. 395, in the guarantee of the six per cent. interest. By these several provisions the payment of the interest on the sterling bonds, as well for the specified three years as afterwards, was secured to the State for its indemnification. The express obligation to pay for three years was for that purpose. The perpetual guarantee of the six per cent. was of like import; otherwise the State must be considered as only stipulating for her indemnification for three years; whereas the whole arrangement shows it to have been the design not only to indemnify the State temporarily, but perpetually. The payment of the five per cent. for three years provided by the Act of 1838, ch. 386, without reference to the profits of the work; and the six per cent. by the Act of 1835, ch. 395, guaranteed upon the profits, were both intended for a similar purpose, to wit : to provide the fund by which to discharge the liabilities of the State on account of the bonds. The six per cent. provided by the Act of 1835, ch. 395, could have no other object, after the currency bonds which that Act authorized, and the interest upon which was to be therewith met, had been superseded by the sterling bonds of the Act of 1838, ch. 386. The company was obliged to pay the five per cent. on the sterling bonds for three years, for the State's indemnification ; the six per cent. in question must by intendment be for a like purpose, without the Act in so many words expressly so providing. If the one was to indemnify the State, so was the other unquestionably. After the expiration of the three years, the payment of the six per cent. was provided by the parties to meet the State's obligation for interest on the sterling bonds used by the company, and the costs and charges incident to

the foreign payment. By the express provisions of these Acts and their fair construction, the State authorized the company to borrow the money in Europe for its own use upon the credit and authority of the sterling bonds, to be paid in gold. The company, with a view of indemnifying the State, and to enable the State to meet the indebtedness, obliged itself to pay to the State six per cent. annually after the three years specified in the Act of 1838, ch. 386. The clear and necessary import of the stipulations between the parties, to my mind, shows the contract to be one of indemnity and equivalents; and that the company contracted to pay to the State sufficient to cover the State's disbursements on its account either in currency or gold.

But if the statutes in question do not make the contract one of indemnity, and the State is merely a creditor or stockholder, the special provisions of the contract will not be gratified if the company is permitted to discharge its part of the contract in currency, whilst the State is required to meet her obligations in gold. The mutual obligations of the same contract require the same medium of payment to be applied to both parties. Neither party, as the terms of the contract show, intended that the State should be a loser by the accommodation, and any construction so resulting, must be erroneous.

Parties may expressly or constructively contract to pay in gold or paper, in meal or malt, or other commodity; and in the same contract there may be stipulations for respective payments in different mediums; but when the contract is silent as to the one, and express as to the other, I know of no analogy, or any inductive process, by which an inference can be deduced, that the payment is to be made in two different mediums—the one in gold, the other in paper. Without some express provision to that effect, I am not able to perceive upon what principle of just construction such a result can be reached. I cannot believe that the Supreme Court ever intended to sanction such an application of the Legal Tender Laws of Congress.

The debt contracted by the State for the use of the company was to be paid in gold. The only source provided in the contract for such payment, was the stipulated amount to be paid by the company to the State, and designed by the contracting parties to be the equivalent of the interest payable by the State, which could not be the case unless paid in gold. The obligations of the same contract as to the parties and subject-matter, contracted on the one side with corresponding liabilities on the other, predicated upon the theory of their discharge, on either or both sides in gold, cannot be gratified by requiring one party to meet his in gold and allowing the other party to discharge his in a depreciated medium.

The majority of this Court has treated the contract between the State and company as if it were an ordinary one for the payment of money, that is, that the company was simply bound to pay the six per cent. as so much money generally, without other purpose or object (whether considered as interest or dividend was immaterial,) and viewed in that light, that it was embraced by the rulings of the Supreme Court upon the Legal Tender Acts.

If that were the true interpretation of the contract, and it contained but the simple obligation to pay the six per cent. upon the stock or loan, as such, disconnected from the other consideration, that the six per cent. so to be paid was to enable the State to pay the interest on the debt contracted by the company, or by the State on her account, there might be ground for resting the case upon the decisions of the Supreme Court, and permitting the company to discharge its obligations in the currency provided by the Legal Tender Acts.

But with deference to their views, I submit that the contract is a special one, and for a specific purpose, to wit: In consideration of the State having agreed to deliver the sterling bonds to the company to enable it to realize the money thereon, the company contracted to pay to the State five per cent. per annum on the sterling debt or stock, as it is called

in the Act, for the term of three years, to be secured by a lien on all its property and revenues, or by reservation of bonds, and ever afterwards six per cent. per annum, secured by a pledge of stock guaranteed to pay six per cent. from the gross profits of the company. Construed with all its stipulations, it was not a mere obligation on the part of the company to pay money generally, but specifically to pay money to meet the interest on the debt contracted by the State for the company. The payments were made sufficient for that purpose by the tenor and effect of the contract between the parties, and it was not the mere "supposition or expectation of the State" that this would be so, but the imperative obligation of the company and the corresponding right of the State, according to the contract, that it should be so; and nothing short of a positive or constructive violation of the contract in this particular, can enable the company to be discharged by paying a less amount than the State has to pay on the debt, according to my judgment.

It seems to me, much of the fallacy of the view taken in defence of the company, proceeds from considering the case as if there were two several and distinct contracts between the State and the company.

By the one, that the State simply agreed to advance the sterling bonds, the company to pay the State interest thereon, as creditor or stockholder of the company. By the other, that the company agreed to pay the six per cent. to the State for the loan of the sterling bonds. Whereas, in legal contemplation, the Acts referred to, constitute but a single contract between the parties, with mutual stipulations and obligations as stated.

Where there are relative and dependent rights and obligations, and mutual stipulations between the parties, well defined and prescribed by the one contract, and making a part thereof, and provided for in the creation of the contract, all the elements of the transaction, and the considerations governing the contracting parties must be regarded, in order to

give to the contract such interpretation as will measure out equal and exact justice to each party alike, according to the terms and stipulations of the contract. It certainly does not seem to me to be a just rule to apply to the transactions of these parties in regard to the same contract and subject-matter, to wit: The medium of payment, which compels the one party to pay the debt contracted for the other in gold, and suffer the other party to discharge its indebtedness on account thereof in a depreciated medium.

It is a well settled rule in the construction of contracts that the intention of the parties must be regarded, and this applies as well to the medium of payment as to any other provision, if that be one of the elements of the contract.

If parties contract to pay money generally, although gold may be understood to be the only legal tender, and consequently gold may be in the contemplation of the parties, yet, as I understand the decisions of the Supreme Court, such contract must be taken with the understanding that the law may change the character of the tender of payment.

But if there is a special contract stipulating for payment in gold, from its nature express or implied, gold must be the medium of payment. That stipulation being part and parcel of the contract, must be carried into effect as such in good faith. If a contract provides, by express or implied terms, that whatever should be the medium of payment, gold, silver, paper, or other commodity, of the one, the same should be applied to the other; and the one has to pay in gold, can there be any question that the other is required, under the obligations of the contract, to meet his in gold? Certainly it was, and still is competent for parties so to contract, and the Courts must enforce their contracts accordingly. The provisions of the contract may be express or contingent as to the character of the medium of payment, either in gold, paper, or other commodity; or it may be but a matter of inference, to be deduced from the nature of the obligations of the contract.

The collector in Oregon being required to pay the taxes into the State treasury in gold, therefore as a correspondent obligation the taxpayer could not discharge his indebtedness for the taxes in currency, but must pay them in gold.

The State, in this instance, is obliged by the contract between the parties to pay in gold in Europe on her sterling bonds, issued for the use of the company; and the company agrees and obliges itself to furnish the money in the payment of the six per cent. interest on the correspondent debt it owes to the State on account thereof, which must be in the same kind of money—there being no provision of the contract to discharge the company by any reduced medium of payment. The Supreme Court, in none of its decisions, as I apprehend them, has ever intended to sanction an application of the Legal Tender Acts, capable of accomplishing such unjust and unequal results, in the adjustment of the respective rights of the parties under the same solemn and *bona fide* contract, as inferred by the opposite theory.

According to my apprehension, the six per cent. provided by the Act of 1835, ch. 395, to be paid to the State, was and still is due and payable in gold, and the State is justly and legally entitled to the $289,489 claimed by her.

Judge DOBBIN, of the Superior Court, in my judgment, was right in holding the company bound under the contract, and the mutual stipulations thereof, to pay the claim of the State in gold, and that the Legal Tender Acts and the decision of the Supreme Court thereon, have not relieved the company from that obligation. The judgment below should accordingly be affirmed.