## HELLER, HIRSCH & COMPANY ET AL. *vs*. THE NATIONAL MARINE BANK, NATIONAL PLANTERS' BANK ET AL.

*Corporations—Preferred Stock—Construction of Statute Giving to Preferred Stockholders Priority of Payment Over Creditors— Notice of General Stockholders' Meeting—Insolvency of Corporation—Proceeds of Fire Insurance on Mortgaged Property, Payable to Mortgagor.*

As between creditors and ordinary preferred stockholders, the latter, as owners of the property of an insolvent corporation, are, upon a distribution of its assets, entitled to nothing until its creditors are first fully paid.

But if the statute, under which what is called preferred stock is issued by a corporation, provides that such stock shall constitute a lien on the company's property and be entitled to priority of payment over general creditors, then such stock is not preferred stock in the ordinary sense, although so called in the statute and although it possesses many of the incidents of ordinary preferred stock.

Code, Art. 23, sec. 294, authorizes corporations, instead of issuing bonds secured by mortgage for money borrowed, to issue preferred stock under an agreement, to be acknowledged and recorded in the same manner as conveyances of land, guaranteeing to the holders of such preferred stock a perpetual dividend of six per cent. before any payment of dividends to common shareholders. It is also provided that the holders of the preferred stock shall have all the rights of holders of capital stock and that "said preferred stock shall be and constitute a lien on the franchises and property of such corporation and shall have priority over any subsequently created mortgage or other incumbrance." A corporation which issued preferred stock under the statute became insolvent and was put in the hands of receivers. The buildings and part of the stock in trade of the corporation were subsequently destroyed by fire and the receivers collected the insurance. They also collected rents of the corporation's property and book-accounts due for merchandise sold. The holders of the preferred stock claimed that they were entitled to priority of payment out of the fund so collected as against creditors of the company who became such after the issue of the stock *Held*,

1st. That the preferred stock so issued is entitled to the lien and priority expressly given to it by the statute, and that no principle of public policy is thereby violated.

2nd. That such stock is entitled to priority over claims against the company, which a subsequently created mortgage would have precedence over.

3rd. That the holders of the preferred stock have no lien upon any assets of the corporation except those mentioned in the statute, *i. e.*, the franchises and property owned at the time the stock was issued, until all other creditors are first fully paid, and that it was not intended to create such lien upon articles manufactured for sale by the corporation.

4th. That the preferred stockholders have consequently no right to claim priority of payment from the fund arising from the insurance policies or from the book-accounts for merchandise sold or from the rents collected by the receivers.

The above-mentioned statute provided that the preferred stock could only be issued when authorized by a general meeting of the stockholders. Code, Art. 23, sec. 6, provides for a meeting of stockholders when the directors refuse to call it, after request, by ten days' notice in two newspapers.　Sec. 76 of said article provides for calling a meeting of stockholders for the purpose of increasing or diminishing the capital stock after four weeks' notice in one newspaper and by post.　*Held*, that a meeting called under sec. 76 for the issue of preferred stock is properly called.

When insured property upon which a mortgage or other lien exists is destroyed by fire, the mortgagee or other creditor has no right to the proceeds of the insurance policies unless there be an express agreement to that effect ; and the insolvency of the mortgagor or debtor does not operate to create a lien on the fund arising from the insurance.

Appeal from a decree of the Circuit Court of Baltimore City (WICKES, J.), by which it was adjudged that the holders of the preferred stock of the Chesapeake Guano Company have a lien upon the property of the corporation, including the moneys collected by the receivers, and are entitled to priority over creditors of the corporation whose debts were contracted subsequently to the time when said stock was issued.

The cause was argued before McSHERRY, C. J., FOWLER, BOYD and PAGE, JJ.

*Edgar H. Gans* and *Vernon Cook* (with whom was *B. H. Haman* on the brief), for the appellants.

A creditor has, first, a right to have his debt paid, but second, has no right to have a share in the profits of the corporation, and no vote in the management of the same.

A stockholder, on the other hand, has first, no right to demand from the corporation a return of principal of his stock, but second, has a right to share in the profits of the corporation and has a vote in the management of the same. Thus the two are essentially different; each has those very rights which are denied to the other. Recognizing this essential distinction, all the later authorities hold that a preferred stockholder is not a creditor, but a stockholder. The stockholder and even the preferred stockholder is, so to speak, a partner in the business of the corporation and "his chance of gain by the operations of the corporation throws on him, as respects creditors, the entire risk of the loss of his share of the capital, which must go to satisfy the creditors in case of misfortune. He cannot be both creditor and debtor by, virtue of his ownership of stock." *Warren* v. *King*, 108 U. S. 389, 399; *Hamlin* v. *Toledo*, 76 F. 671. " The relation of the holder of preferred stock is in some aspects similar to that of a creditor, but he is not a creditor save as to dividends after they are declared; nor does he sustain a dual relationship to the corporation. He is either a stockholder or a creditor. He cannot by virtue of the same subscription be both." 2 *Beach on Corp.*, section 505; *Chaffee* v. *Rutland Co.*, 55 Vt. 110 and 126.

No statute is to be found in any of the States exactly similar to our Maryland statute, but a number of decisions upon statutes or contracts, more or less similar to the one now in question, throw much light on the subject. The more important cases are as follows: *Warren* v. *King*, 108 U. S. 389; *Hamlin* v. *Toledo*, 76 Fed. Rep. 664; *St. John* v. *Erie R. R. Co.*, 10 Blatch. ·271; *Same case*, 22 Wall. 136; *King* v. *O. M. R. Co.*, 2 Fed. Rep. 36; *Branch* v. *Jessop*, 106 U. S. 468; *N. Y. L. E. R. R.* v. *Nickals*, 119 U. S. 296; *Chaffee* v. *Rutland*, 55 Vt. 110; *Field* v. *Lamson*, 162 Mass. 388. See also 1 *Morawetz, Corporations*, sec. 444, page 417; 2 *Beach, Private Corporations*, sec. 505, page 815; *Cook on Corporations*, sec. 271, *sq.*

A perusal of these and the other authorities cited above

will show us the essential characteristics of preferred stock in general. These characteristics may be summarized as follows: (1). It is essentially capital. 1 *Morawetz,* section 444; 2 *Beach,* section 505. (2). It is entitled to vote and a voice in the management of the company. *Cook on Corp.,* section 209; 2 *Beach,* section 497. (3). It is entitled to share in the profits even in excess of the fixed dividends if there be so much profit. *Cook on Corp.,* section 269; 2 *Beach,* section 501. (4). It is liable for debts to creditors for unpaid subscriptions. *Cook on Corp.,* section 270. (5). Even the payment of dividends on preferred stock must be postponed to payment of debts. *St. John* v. *Erie,* 10 Blatch. 279; *Warren* v. *King,* 108 U. S. 359, 397 and 398; *Hamlin* v. *Toledo,* 78 Fed. Rep. 664–670; 2 *Beach,* section 505. (6). Upon dissolution of the corporation and upon the division of assets, preferred stock as to capital has no priority even over common stockholders. *Cook on Corp.,* section 278; 2 *Beach,* section 507; *Birch* v. *Cropper,* 14 App. Cas. 525; *Londonderry India Rubber Co.,* L. R. 5 Eq. 519; *McGregor* v. *Home Ins. Co.,* 33 N. J. Eq. 181; *Griffith* v. *Paget,* L. R. 6 Ch. Div. 511. See also *Code P. G. L.,* Article 23, section 272; *Poe's Supp. to Code,* Article 23, section 264*a.*

No case anywhere has ever held that upon a dissolution and division of assets, the preferred stockholders as to the principal of their stock have any preference over common stockholders, much less over creditors. On the contrary, it has been frequently laid down as a rule that it would be contrary to public policy, essentially unjust and inequitable to pay preferred stockholders before creditors. *Cook on Corp.,* sec. 271; *St. John* v. *Erie,* 22 Wall. 147; *Hamlin* v. *Toledo,* 78 Fed. Rep. 671; 2 *Beach,* sec. 502; *Lockhart* v. *Van Apstyne,* 31 Mich. 76. From these authorities it is manifest that we cannot construe the Maryland statute as giving the principal of the stock a lien, without involving an essential contradiction, and without importing into the statute a device which is universally declared to be unjust,

inequitable and against public policy. It was argued in the lower Court by the counsel for the preferred stockholders, that public policy cannot override the statute law of a State. This may be true, but certainly where a statute is open to two constructions, one of which offends well-settled principles of public policy, while the other does not, the Courts will unhesitatingly adopt that construction which is consistent with public policy, rather than the one opposed thereto.

*Frank Gosnell* (with whom was *T. M. Lanahan* on the brief), for the appellees.

The certificate relating to the issue of the preferred stock of the Chesapeake Guano Company, and the agreement executed and recorded, are all in conformity with the statute, and give the fullest notice to the creditors of the corporation of the lien thereby placed upon its franchises and property, and those who become creditors after the recordation, became such subject to that lien.

The law relating to preferred stock in Maryland, as it appears in the Code to-day, is so plain and explicit "that he who runs may read." Our law is conceded to be wholly dissimilar to the enactments of every other State upon the subject, yet decisions of Courts construing those other statutes and certificates of preferred stock issued by virtue thereof, were cited by counsel for the appellants and urged upon the Court below as a guide in determining what our Legislature meant in passing the law in controversy. A bare statement of the facts in these cases will show how absolutely inapplicable they are to the question at bar.

One of the contentions is that the preferred stock in the case at bar has no validity whatever, because not authorized by a general meeting of the stockholders of the corporation called as provided in section 6 of Article 23 of the Code, page 286, in that there was a failure upon the part of the directors to give notice of the meeting in two papers published in the city of Baltimore, it having been published in one only. As against this, however, the notice was mailed

to each individual stockholder of the corporation, so that all stockholders had ample notice. It is also error to say that notice, under section 6, shall be given by the stockholders, as an inspection will show that it is only in event of the directors refusing to give the notice that the stockholders may call the meeting. As the meeting was for the benefit of the stockholders only, and the creditors and others were not interested, they cannot be heard now to object to the want of notice as prescribed by law, or to urge upon the Court the alleged invalidity of the stock by reason of the fact that notice of the general meeting was not published in two papers. Section 635, *Morawetz on Private Corporations* (2 ed.), pages 635–7; *Beecher* v. *Marquette Rolling Mill Co.*, 45 Mich. 103–109; *Rochester Savings Bank* v. *Averell*, 96 N. Y. 467; *Wood* v. *Corry Waterworks Co.*, 44 Fed. Rep. 146; *First Nat. Bank* v. *G. V. Mining Co.*, 89 Fed. Rep. 447; *Hardware Company* v. *Phelan*, 128 Pa. St. 110; *S. C.*, 18 Atlantic Reporter, 428; *Miller* v. *Matthews & Kirkland*, 87 Md. 464.

McSHERRY, C. J., delivered the opinion of the Court.

The contention in this case is between the holders of what is called preferred stock and creditors of an insolvent corporation.

The stockholders of the Chesapeake Guano Company, a corporation formed under the general corporation laws of this State, voted some years ago to increase the company's capital by the issue of sixty thousand dollars of preferred stock. Without pausing at this point to examine whether the method pursued was the proper one or not, it suffices for the present to say that the authorized shares were all taken. Subsequently the company contracted the debts due to unsecured creditors and thereafter became insolvent, and its property and assets were placed in the hands of receivers. The funds now for distribution arose from sources that will be named hereafter. As the discussion requires, and the ultimate decision of the controversy involves, for

the first time, a judicial interpretation of the statutes under
the provisions of which this stock was issued, the enact-
ments, though somewhat lengthy, will be set forth in full.
They are contained in *Sec. 294, Art. 23, of the Code.* This
section is made up of two Acts of Assembly passed at dif-
ferent periods. They are the *Act of 1868*, ch. 471, sec.
219, and the *Act of 1880*, ch. 474. In transcribing them
below the terms of the later Act will be put in italics, so
that they may be easily distinguished ; and more especially,
so that the radical changes they made in the substance of
the thing with which the Legislature had dealt under the
earlier, may be more readily perceived. The following are
the words of the Code : " Every corporation incorporated
under the laws of this State, which has the power to issue
bonds as evidences of indebtedness, and to secure the same
by mortgage of the property of such corporation, or which
has the power to obtain such money upon mortgage, may,
whenever in the judgment of said corporation it is expedi-
ent to do so, in place of issuing such bonds and securing
the same by a mortgage of the property of said corpora-
tion, or instead of obtaining money upon mortgage, issue a
preferred stock for any amount for which said corporation
may be authorized to issue its bonds, or for any amount which
the said corporation may be authorized to obtain upon
mortgage of its property, and may dispose of the said stock
by sale, on such terms as it may prescribe, or by permitting
the same to be subscribed for, as in the judgment of said
corporation may be deemed expedient ; and every corpora-
tion creating such preferred stock as aforesaid, may execute
as agreement under seal, *to be acknowledged as conveyances
of land are required to be acknowledged, and recorded in
the office of the Clerk of the Circuit Court for the county
where the principal office of such corporation shall be situated,
or in the office of the Clerk of the Superior Court of Balti-
more City, in case such office shall be situated in said city*,
guaranteeing to the purchasers of, or subscribers to, such
preferred stock, a perpetual dividend of six per centum per

annum out of the profits of the said corporation, payable
yearly or half-yearly, as said corporation shall determine,
before any dividend is distributed to any of the stockholders
of the said corporation, other than the holders of said pre-
ferred stock so created; and the holders thereof shall have
all the incidents, rights, privileges and immunities, and lia-
bilities, to which the capital stock of said corporation, or
the holders thereof, may be entitled or subject; provided,
however, that no corporation shall exercise any power under
this section, unless the creation of such preferred stock
shall be authorized by a general meeting of the stock-
holders of such corporation; *and the said preferred stock
shall be and constitute a lien on the franchises and property
of such corporation, and have priority over any subsequently
created mortgage, or other incumberance."* The provision
requiring an agreement to be executed and to be placed on
record was strictly complied with. The certificates were
issued and the amount subscribed was fully paid. There-
after the debts which it is claimed ought to be paid out of
the fund now in Court for distribution, were contracted.
The fund arose in this way: The improvements on the
company's property—that is, the buildings and machinery—
together with the stock in trade, were insured by the cor-
poration against loss by fire. After the receivers had been
appointed these improvements and this stock, or some of it,
were burned. The receivers collected the insurance. This
constitutes part of the fund. The rest is made up of book-
accounts and rents collected by the receivers. No part of
the property, real or personal, except, perhaps, stock in
trade, appears to have been sold. The holders of the pre-
ferred stock—or of what is called preferred stock—issued
under the above quoted section of the Code, claim that
they are, as holders of those shares and in virtue of the
terms of the statute, preferred creditors and entitled, in
consequence, to be paid back out of these funds the amount
paid in by them on their shares, whilst the persons who
became creditors of the company after the recording of the

agreement already alluded to, insist that *they* are entitled to be paid the debts due to them before any distribution is made to the stockholders.    Thus this feature of the controversy is sharply defined.

If this stock is preferred stock, pure and simple, the contention of the creditors is right.    The law is perfectly well settled that as between creditors and ordinary preferred stockholders, the latter, as owners of the property of an insolvent corporation, are, upon a distribution of its assets, entitled to nothing until its creditors are first fully paid. There is a palpable difference between the relation of a stockholder and a creditor to the corporate property. Stock, whether preferred or common, is capital; and generally speaking, a certificate of stock merely evidences the amount which the holder has contributed to or ventured in the enterprise.    Such a certificate, representing nothing more than the extent of his ownership in the capital, cannot well be treated as indicating that he is, by virtue of it alone, also to the same extent a creditor who may compete with other creditors in the distribution of the fund arising from a conversion of the corporation's assets into money. He cannot, if he is simply an ordinary preferred stockholder, in the nature of things, so far as third persons are concerned, be at one and the same time and by force of the same certificate, both part-owner of the property and creditor of the company for that portion of its capital which stands in his name.    His certificate, therefore, in such circumstances, merely measures the *quantum* of his ownership.    As his chance of gain throws on the stockholder, as respects creditors, the entire risk of the loss of his contribution to the capital, it is a fixed characteristic of capital stock that no part of it can be withdrawn for the purpose of repaying the principal of the capital until the debts of the corporation are satisfied.    *Warren* v. *King*, 108 U. S. 389; *Cook on Stock, &c.*, sec. 271; *Hamlin* v. *Toledo, St. L. & K. R. R. Co.*, 47 U. S. App. 422; *S. C.*, 36 L. R. A. 826.    Whether this characteristic may be modified by statute will be con-

sidered later on.   To be strictly accurate, we ought to say there is a sense in which a shareholder is a creditor.   In that sense every corporation includes its capital stock amongst its liabilities, but it is a liability which is postponed to every other liability.   And as to the matured and unpaid guaranteed dividends due on preferred stock, the relation of creditor undoubtedly exists.   *B. & O. R. R. Co.* v. *State*, 36 Md. 541.

But, after all, is this particular stock, technically speaking, ordinary preferred stock, and subject consequently to the legal incidents and characteristics of that species of property?

If you call it preferred stock, and it *is* what you call it, then the law is perfectly clear that it has no priority over the contesting creditors.   If you call it preferred stock, and it is *not* preferred stock, then, obviously, it is not governed by the principles applicable to preferred stock, but by those relating to the thing that it really is.   The mere naming of it does not make it that which it is named, if, in fact, it is something else.   Its properties and qualities determine what it is.   If the statute calls it what its properties and qualities show that it is not, surely it does not thereby become what it is misnamed, and cease to be what it essentially is.   Calling stock preferred stock does not *per se* define the rights in such stock, but these depend on the statute or contract under which it was issued.   *Elkins* v. *Cam. & A. R. Co.*, 36 N. J. Eq. 233.   As said by the Supreme Court of Ohio : " To call a thing a wrong name does not change its nature.  A mortgage creditor, although denominated a preferred stockholder, is a mortgage creditor nevertheless;  and interest is not changed into a dividend by calling it a dividend.   Nothing is more common in the construction of statutes and contracts than for the Court to correct such self-evident misnomers by supplying the proper words.   To use the language of the Court in *Corcoran* v. *Powers*, 6 Ohio St. 19, 'The question in such cases is, not what did the parties call it, but what do the facts and cir-

cumstances require the Court to call it.' "   *Burt* v. *Rattle*,
31 Ohio · St. 116.   Courts are not influenced by mere
names.   They look beyond these and give to the subject
dealt with the character—the *status*—which its properties
denote it possesses.   The qualities and properties of a thing
are its essentials—they define and mark *what* it is—the
name is· purely accidental—it is no part of the thing named.
If, then, the thing which the statute contemplates, posses-
ses the characteristics and qualities of preferred stock—
*and possesses none other*—it *is* preferred stock; but if, on
the other hand, it possesses characteristics and qualities that
are entirely foreign to preferred stock as strictly defined, and
that are descriptive of something else, then the thing is ob-
viously either not ordinary preferred stock, or not pre-
ferred stock at all, even though it be called preferred stock,
and have in addition to its own qualities some of the char-
acteristics that do pertain to preferred stock.   Precisely
because preferred stock has *no* lien on the company's prop-
erty and cannot be repaid in advance of general creditors, it is
necessarily true that a security which *is*, by express and em-
phatic legislative enactment, entitled to just such a lien and
just such priority, is *not* preferred stock technically speaking,
though called by that name and though having many features
incident to preferred stock.   The whole ingenious and ex-
ceedingly able argument for the appellants proceeded upon
the assumption that this is ordinary preferred stock, be-
cause called preferred stock, and because it possesses the
incidents of such stock (but it ignored the fact that it has
a quality which preferred stock has not), and the conclusion
thence deduced was, that being that kind of stock it has
no preferential lien.   Now, the converse is exactly true.   If
the statute plainly gives a lien and a preference, then this
so-called preferred stock is not ordinary preferred stock at
all, no matter what it is called and no matter what inci-
dents it may have in common with preferred stock, and
therefore, it has not that particular characteristic which,
if it were ordinary preferred stock, would defer it to the

claims of unsecured creditors. Brushing aside the name, let us see what are the essential qualities of this statutory creation.

The *Act of 1868*, ch. 471, sec. 219, authorized corpora- tions to issue preferred stock. It was an alternative method of obtaining money. Any corporation which, under its charter, had authority to borrow money and issue bonds therefor, and secure the payment of the bonds by mortgage, might, instead of resorting to that method, issue preferred stock. In issuing it the companies were empowered to execute an agreement guaranteeing to the purchasers of, or subscribers to, such preferred stock, a perpetual divi-dend of six per cent. out of the profits of the corpor-ation before any dividend could be paid to the holders of the common stock. The holders of such preferred stock were given all the incidents, rights, privileges and immuni-nities, and made subject to all the liabilities to which the holders of common stock were entitled or subject. This was strictly and technically ordinary preferred stock. It had no priority over creditors or over subsequent mort-gages or incumbrances, and it had no lien on the franchises or the property of the corporation. It merely guaranteed a dividend of six per cent. out of the profits—that is the net profits—and if there were no profits there would be no divi-dend. Its priority was simply a priority over the usual rights and interest of another, but subordinate, class of stockholders. That is the kind of preferred stock authorized by the *Act of 1868*, as a mere glance at its provisions—quoted in the beginning of this opinion, *omitting the lines in italics*— will demonstrate. In the language of the Supreme Court *Warren.* v. *King, supra*, " It would be difficult to say that these statutory provisions allowed any preference in shares of capital stock, except a preference amongst classes of shares, or any preference of any class over creditors. * * * * There is nothing in the certificate that clothes them with a single attribute of a creditor." The stock authorized by the *Act of 1868*, was not only called preferred stock, but

it had every incident of stock, and none that was not. For twelve years the statute remained unchanged. Shares issued under it were, as we have said, essentially shares of capital with none of the qualities of an evidence of debt, and shareholders were simply owners of the capital, with none of the rights of creditors of the company. But in 1880 the statute was amended by the addition of the words in *italics*. By the provision requiring the agreement to be recorded no change was effected in the relation of the preferred to the common shareholder—the former was given no greater right over the latter than he had before the agreement was required to be recorded—and the relation of the preferred shareholder to the company's subsequent creditors was not disturbed unless the last clause, giving the shareholder a lien and declaring a preference in his favor, altered the *nature* of the preferred stock and made it something that it had not been under the *Act of 1868.* If the clause giving the shareholder a lien and a priority did not create a new species of preferred stock, or a security differing radically from ordinary preferred stock, it is difficult, if not impossible to assign any reason for the adoption of the *Act of 1880.* The clause specifically declaring that "the *said preferred stock* shall be and constitute *a lien* on the *franchises* and *property* of such corporation, and have *priority* over any subsequently created mortgage or other incumbrance," essentially changed the whole nature of the thing antecedently described as preferred stock, and the statutory lien converted it into something wholly different. The statute says "said preferred stock"—not the guaranteed dividend thereon—shall be and constitute a lien on the property and franchises of the company. If you say the lien only extends to the dividend, then you say the stock shall *not* be a lien, though the Legislature said it should be.

Preferred stock under the *Act of 1868* had no lien whatever ; this statutory preferred stock, under the *Act of 1880* —" The said preferred stock "—*has* a lien on franchises and on property. Preferred stock under the *Act of 1868* had

no priority over creditors; this statutory preferred stock
under the *Act of 1880 has* priority over subsequent mort-
gages and incumbrances.   The two are therefore intrins-
ically different, and the argument that gives to the lat-
ter no greater effect or wider range than the former posses-
sed, simply because of the identity in the name applied to
both, must totally ignore and in fact expunge the clause of
the statute expressly creating the lien.   If this statutory
preferred stock has a lien, then it differs from ordinary pre-
ferred stock in that it *has* the lien.   If, because it is called
preferred stock, it has no lien, though the statute says it
shall have, then the name controls the substance, and the
lien expressly given is simultaneously taken away by the
name conferred.   Either the name or the substance must
yield and certainly the latter cannot be made subordinate
to the former.

Giving to the holder of what the *Act of 1880* designates
preferred stock, a lien is not without precedent.   It *can* be
done and the ultimate question always is, *has* it been done?
That it can be done a few citations will show.   In *Elliott
on Railroads*, sec. 85, the general rule is thus stated: "Un-
less a preference in payment of capital invested has been
specially contracted for (*Re Bangor, &c. Co.*, L. R. 20, Eq.
59; *Re Bridgewater Nav. Co.*, L. R. 39 Ch. Div. 1), *or is
given by statute* (*McGregor* v. *Home Ins. Co.*, 33 N. J. Eq.
181), the holder of the preferred stocks hares equally with
the common shareholders in a distribution of assets upon
dissolution   *   *   *   *.   This results from the rule that
he is a stockholder and not a creditor."   " But much," the
same author proceeds to observe in *Sec. 86*, "will necessarily
depend upon the language used, and where the interest is
guaranteed absolutely and the corporation also agrees to
liquidate the principal at a specified time, *or the like*, so that
the so-called stock is in reality an interest-bearing deben-
ture, the relation created thereby will be that of debtor and
creditor, and the holder will not be merely a stockholder
as he would be if it were preferred or interest-bearing stock

payable only out of the profits (*Burt* v. *Rattle*, 31 Ohio St.
116; *West Chester R. R.* v. *Jackson*, 77 Pa St. 321 ; *Totten*
v. *Tison*, 54 Ga. 139). Its validity, therefore, would de-
pend upon some other power than the power to issue pre-
ferred stock." And in *Cook on Stock, &c.*, *Sec.* 271, it is
said : "A mortgage to secure preferred stock and dividends
thereon has been upheld in a few cases. In other cases that
which was called preferred stock was nothing more than in-
come bonds with a voting power." In the case of *Garrett
et al.* v. *May et al.*, 19 Md. 191, the late Mr. Reverdy
Johnson, in his argument, spoke of the " income bonds,"
which were there the subject of controversy, as equivalent to
preferred stock. As the interest and principal of the bonds
were payable out of income, it meant net income. " The
holder," he said, " is thus made only a preferred stock-
holder." "Occasionally, however," remarks Mr. Cook,
*sec. 271 Stock, &c.*," a mortgage is given by the corporation
to secure the payment of dividends on preferred stock and
to give it a preference in payment over subsequent debts of
the corporation upon insolvency or dissolution. It is diffi-
cult to see how such a mortgage could be legal *except*
when it is issued under *express statutory authority*." In
*West Chester R. R.* v. *Jackson, supra*, it was said by JUDGE
WOODWARD, speaking for the Court, "A corporation may
issue new shares and give them a preference as a mode of
borrowing money, where it has power to borrow on bond
and mortgage, as preferred stock is only a form of mort-
gage." In *Skiddy* v. *Atl. R. R.*, 3 Hughes, 355, it was held
that where preferred stock had been issued, reciting that the
stipulated interest was a lien on all the property of the corpor-
ation after the first mortgage, the lien would be upheld by the
Court as against subsequent mortgages and general credi-
tors, though such lien had not been secured by any mort-
gage.

There ought, then, be no doubt that this method of creat-
ing a lien in favor of a stockholder *can* be resorted to, if
the Legislature sees fit to authorize it. That it has author-

ized it by the terms of the *Act of 1880*, hereinbefore trans-scribed and put in *italics*, is, it seems to us, perfectly clear. The General Assembly has, in plain and unmistakable words, declared that this particular kind of stock—the " said preferred stock "—shall be and constitute a lien on the company's property.    No language could be more ex-plicit ; and, most certainly, Courts have no authority to reject or to disregard it.   Stock issued under this Act is consequently a lien on the property of the company issuing it, and entitled to the preference which the statute gives it.

It is no answer to say that the giving of such a lien is nugatory by reason of a lien being inconsistent with the properties and qualities of stock ; because it is quite ob-vious that after a lapse of twelve years the Legislature, by adopting the *Act of 1880*, intended to do just what it did do, even though in doing it the nature of the thing dealt with was changed and a new and entirely different statutory preferred stock was created.    That it had the power to do this cannot be disputed.    There was neither physical nor legal impossibility in the way ; and no principle of sound and enlightened public policy was invaded.    The *substance* of the thing was changed, the *name* was retained.

Much was said in the argument, and something is to be found in the books, about such liens in favor of stockholders being void because against *public policy ;* but Sir George Jessel, M. R., in dealing with that indefinite and variable quantity called public policy, said in *Printing and Numer-ical Reg. Co.* v. *Sampson*, L. R. 19 Eq. 465, " It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred, and shall be enforced by Courts of Justice.    Therefore, you have this paramount public policy to consider—that you are not

lightly to, interfere with this freedom of contract. Now, there is no doubt public policy may say that a contract to commit crime, or a contract to give a reward to another to commit crime, is necessarily void. The decisions have gone further, and contracts to commit an immoral offence, or to give money or reward to another to commit an immoral offence, or to induce another to do something against the general rules of morality, though far more indefinite than the previous class, have always been held to be void. I should be sorry to extend the doctrine much further." In the case of *U. S.* v. *Trans-Mo. Freight Ass.*, 166 U. S. 290, the Supreme Court had under review the Act of Congress of July 2nd, 1890, enacted "to protect trade and commerce against unlawful restraints and monopolies." It was argued that the impolicy of giving to the Act the construction which its language plainly conveyed, was so clear that it could not be supposed Congress intended the natural import of the words it had used; but a majority of the Court, speaking through MR. JUSTICE PECKHAM, said: "The public policy of the government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the Courts and the constant practice of the government officials; but when the law-making power speaks upon a particular subject, over which it has constitutional power to legislate, *public policy in such a case is what the statute enacts.*" It is impossible to see how the lien given to this peculiar preferred stock can be treated as invalid on the ground that it contravenes public policy, since the explicit words of the statute declare a policy with which the lien that is given is essentially in accord. It must be, said this Court in *Trust Estate of Woods, Weeks & Co.*, 52 Md. 520, a very plain case to justify a Court in holding a *contract* to be against public policy. We are dealing now, not with a contract, but with a *statute*.

None of the cases cited by the appellant's counsel arose upon *statutes* containing such a provision as is set forth in *the Act of 1880*. They are for that reason distinguishable

from this case. They all dealt with ordinary preferred stock—and not with stock issued under a special legislative enactment declaring that stock created thereunder shall be and constitute a lien on the company's property and shall have priority over subsequent mortgages and incumbrances.

If this statutory preferred stock has priority over any subsequently created mortgage or incumbrance, it must have priority over the claims which such subsequently created mortgage would itself have precedence over. It would be a solecism—an incongruity—to say that the stock shall have priority over subsequently created mortgages and of course, therefore, over those claims which would be deferred to such mortgage, where there is one; and yet shall have no priority over the same claims where there is no mortgage. Obviously, the statute means a priority over subsequent mortgages *and* over such claims as such subsequent mortgages would have preference over. Suppose these claims were secured by a mortgage executed after the issue of the stock. Would not the mortgage be postponed, by the express terms of the statute, to the prior lien of the stock? Can claims, when unsecured by a mortgage, take precedence of the stock to which they would be subordinate if they were in the form of a mortgage? If they can, it must be solely because when unsecured they are given a priority which is denied them when they are secured; thus reversing the ordinary rule and placing an unsecured claim in advance of a secured one. The statute cannot be interpreted in a way to produce such a result.

We now come to the inquiry as to whether the stock was properly issued. The statute prohibits the issue of this kind of stock " unless the creation of such preferred stock shall be authorized by a general meeting of the stockholders of " the corporation. It is objected that a general meeting of stockholders was not properly called, because, first, the meeting which did assemble, was called by the directors and not by the stockholders; and secondly, because notice was given in but *one* instead of in *two* newspapers. This

objection is founded on *Sec. 6*, *Art. 23* of the Code, and altogether disregards *Sec. 76* of the same Article.   Sec. 6 permits stockholders to call a general meeting only when the president and directors refuse to call it after being required by the stockholders to do so.  The notice prescribed by *Sec 6* is *ten* days, and when the corporation is located in Baltimore City, this notice must be published in *two* newspapers.   Upon turning to *Sec. 76* it will be found that provision is made for calling a meeting of the stockholders for the purpose of increasing or diminishing the amount of the capital stock.   This notice must be given by the directors or a majority of them; it must be published in one paper and a copy must be mailed to each stockholder; and the length of the notice must be four weeks.  All the provisions of *Sec. 76* were strictly complied with.   Whilst *Sec. 6* provides generally for calling meetings of stockholders, *Sec. 76* provides specially for the case of a meeting called for a particular purpose.   The general provision must yield to the particular, when the thing to be done is that which the latter has relation to.   The proviso requiring a general meeting of stockholders to authorize the issue of preferred stock was contained in the *Act of 1868*, before the amendment of 1880.   The issue of preferred stock under the *Act of 1868* was necessarily an increase of the capital, and the proper method to be pursued in calling a meeting of the stockholders to determine whether such preferred stock should be issued was the one pointed out in *Sec. 76*.  The changes made by the *Act of 1880* in the characteristics of this stock did not change the mode to be followed in securing the sanction of the stockholders to its issue.   As that mode— the one designated in *Sec. 76*—was strictly followed, the objection founded on the failure to comply with *Sec. 6* must fall.

This brings us to the only other question in the case; and that is whether the sums collected by the receivers from the various sources indicated above, can be claimed by the holders of this preferred stock, or must be paid to

the unsecured creditors.   If the fund collected from the insurance companies is payable to the stockholders rather than to the unsecured creditors, it must be so payable, because the lien on the franchises and property of the company is, by reason of its being a lien on the franchises and property, a lien on the money paid by the insurance companies to the receivers, under the policies indemnifying the Guano Company against loss by fire.   But since the decision by LORD CHANCELLOR KING, in the case of *Lynch v. Dalzel*, 3 Bro. Par. Cas. 497, it has never been disputed that a policy of insurance against loss by fire is only a personal contract of indemnity against a possible loss on account of the interest of the insured in the thing mentioned in the policy.   Such personal contracts of indemnity do not attach to the realty or in any manner go with the same, as incident, by any conveyance or assignment, unless there is, in addition, some special stipulation to that effect between the insurer and the insured.   *Wash. Fire Ins. Co.* v. *Kelly*, 32 Md. 441; *Wheeler* v. *Ins. Co.*, 101 U. S. 442 ; *Ins. Co.* v. *Stinson*, 103 U. S. 29 ; *Palmer Sav. Bk.* v. *Ins. Co. North Amer.*, 166 Mass. 189 ; *S. C.*, 32 L. R. A. 615.   Consequently a mortgagee, and for the same reason any other lien creditor, has no right to claim the benefit of a policy underwritten for the mortgagor or owner of the property, unless there is an express agreement permitting it.   The insolvency of the mortgagor or debtor cannot operate to expand the lien held by the mortgagee or creditor ; or bring within the scope of that lien a fund which, according to settled principles, is not subject to its operation.   If the proceeds of such a policy are not covered by the lien which the creditor holds, the subsequent insolvency of the debtor cannot bring them under the lien ; because, mere insolvency can, of itself, in no instance, amplify a lien, whose existence and extent depend wholly upon the terms of the contract creating the lien.   There is no pretence that there was any special stipulation between the Guano Company and the preferred stockholders appropriating to the latter, in the event of a

loss by fire, the funds which might be realized under the policies of insurance ; and it of course follows, that these stockholders have no lien upon those funds, and having no lien upon them they have no claim to them ; because these stockholders are not general creditors, and have no right to appropriate to the payment of their stock any assets other than those which the statute specifically subjects to their lien, until the general and other creditors are first fully paid.

With regard to the book-accounts collected by the receivers the record discloses very little. Presumably these book-accounts represent sums due to the company for merchandise sold by it. It does not appear at what time this merchandise was acquired, but it was probably long after the creation of the preferred stock. However this may be, it cannot be held that the money when collected was covered by the lien given by the statute unless the merchandise sold for that money was itself subject to that lien when sold. It cannot be successfully contended that the lien attached to merchandise which the company was engaged in making for sale, without at the same time conceding that every article sold went into the possession of the purchaser charged with the lien. In a manufacturing concern engaged, as the name implies, in the sale of fertilizers, it could never have been the purpose of the statute to attach the lien to the articles produced for sale, as such a lien would effectually prevent any sale and would at once, as a consequence, stop the very business which the company was organized to conduct.

Lastly, with respect to the rents. The lien given by the statute attaches to the franchises and property. Were the lien that of a mortgage on land, the specific thing pledged would be the land. Rents, unless specifically included, would not be conveyed by a pledge of the land ; " they belong to the tenant in possession, whether a mortgagor or a third person claiming under him." *Kountze* v. *Omaha Hotel Co.*, 107 U. S. 378. In *Freedmen's Saving and Trust Co.* v. *Shepherd*, 127 U. S. 494, it appeared that one Bradley exe-

cuted a deed of trust pledging to the Savings and Trust Company certain real estate. The rent accruing from this property was claimed by the Trust Company and by other creditors of Bradley. In denying the claim of the Trust Company the Supreme Court said: "Bradley's deed pledged the property, not the rents accruing therefrom, as security for the payment of his. notes." See also *Gilman* v. *Ill. & M. Tel. Co.*, 91 U. S. 603. It is true that when possession is taken by a receiver in behalf of the mortgagee the rents may be appropriated to the payment of the mortgage debt (*Teal* v. *Walker*, 111 U. S. 242), but this lien given under the statute to a preferred shareholder is not the lien of a mortgage, and cannot be expanded so as to include anything more than the Legislature designated— namely, franchises and property.

From what has been said it results that, in our opinion, the so-called preferred stock is a lien on the company's franchises and property owned at the time the stock was issued; but that it is not a lien on the funds now in the hands of the receivers and arising from the sources hereinbefore indicated. In so far as the decree below declared the preferred stock a lien on the franchises and property of the Chesapeake Guano Company, it is affirmed; but in so far as it awarded the funds collected from the insurance companies, from the book-accounts and from the rents of the property, to the preferred stockholders, it will be reversed.

> *Decree affirmed in part and reversed in part and cause remanded that a new decree conforming to this opinion may be signed. The costs to be equally divided between each side.*

(Decided June 22nd, 1899).